Argued and submitted February 9, 2009, at Central Catholic High School, Portland, Oregon; in *State v. Michael K. Rodgers*, S056239, decision of Court of Appeals affirmed; judgment of circuit court reversed, and case remanded to circuit court for further proceedings; in *State v. Anthony Douglas Kirkeby*, S056237, decision of Court of Appeals and judgment of circuit court affirmed February 11, 2010

# STATE OF OREGON,
*Petitioner on Review,*

*v.*

# MICHAEL K. RODGERS,
*Respondent on Review.*

## (CC CM0420629; CA A128857; SC S056239 (Control))

# STATE OF OREGON,
*Petitioner on Review,*

*v.*

# ANTHONY DOUGLAS KIRKEBY,
*Respondent on Review.*

## (CC CR030112; CA A128263; SC S056237)
## (Cases Consolidated for Opinion)

227 P3d 695

Anna Marie Joyce, Assistant Attorney General, Salem, argued the cause for petitioner on review. With her on the

petitions for review and briefs on the merits were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Susan G. Howe, Senior Assistant Attorney General. With her on the reply brief were John R. Kroger, Attorney General, and Rolf C. Moan, Acting Solicitor General.

Peter Gartlan, Chief Defender, Office of Public Defense Services, Salem, argued the cause and filed the brief for respondents on review Michael K. Rodgers and Anthony Douglas Kirkeby.

DE MUNIZ, C. J.

Gillette, J., concurred and filed an opinion.

Durham J., dissented and filed an opinion, in which Linder, J., joined.

**DE MUNIZ, C. J.**

In these two criminal cases, consolidated for purposes of opinion, each defendant was charged with drug-related crimes based on evidence obtained during separate traffic stops. In each case, the Court of Appeals concluded that the officer's conduct unreasonably extended the duration of the traffic stop, in violation of Article I, section 9.[1] *State v. Rodgers*, 219 Or App 366, 373, 182 P3d 209 (2008); *State v. Kirkeby*, 220 Or App 177, 186, 185 P3d 510 (2008). We allowed the state's petitions for review and now conclude that each defendant was unlawfully seized in violation of Article I, section 9, because in each case the police conduct was not justified by reasonable suspicion of criminal activity; was unrelated to the traffic violation investigation, identification, or issuance of a citation; and significantly restricted each defendant's freedom of movement. Because there were no intervening circumstances or other circumstances mitigating the effect of the illegal seizures of each defendant, we conclude that each defendant's consent, even if voluntary, was the product of police conduct that violated Article I, section 9, of the Oregon Constitution. Because the consent to search in each case was a product of the unlawful seizure, the evidence obtained during the search, in both cases, must be suppressed. We therefore affirm the decisions of the Court of Appeals.

## I. FACTS, PROCEDURAL BACKGROUND, AND PARTIES' ARGUMENTS

For purposes of the issue presented here, the relevant facts of each case are undisputed.

### A. *State v. Rodgers*

Defendant Rodgers was stopped by Corvallis Police Officer Van Arsdall for driving a vehicle with a burned-out license plate light in violation of ORS 816.330. Defendant provided Van Arsdall with a valid driver license and vehicle registration, but was unable to provide proof of insurance.

---

[1] Article I, section 9, of the Oregon Constitution provides, in part:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

Defendant explained that the vehicle was borrowed and that he was driving it with the owner's permission. While they were talking, Van Arsdall noticed a large container of blue liquid on the front passenger floorboard and a white sack with a smaller, square, metallic container inside it on the back seat. Van Arsdall also noticed that defendant had sores on his face, which Van Arsdall believed to be consistent with methamphetamine use. Van Arsdall returned to his patrol car and radioed a request for a records check.

In the meantime, a second officer, Kantola, arrived. Van Arsdall explained his observations to Kantola and told him that he believed that defendant had items in his vehicle that likely were used to produce methamphetamine. However, Van Arsdall testified at the suppression hearing that, at that point, he did not have enough information to arrest defendant—defendant's records check had come back clear, and Van Arsdall therefore had a sufficient basis only to issue defendant a traffic citation. Notwithstanding the clear records check, Van Arsdall approached the driver's side of the vehicle, while Kantola approached the passenger side. Van Arsdall asked defendant about the blue liquid, and defendant explained that it was windshield washer fluid. Van Arsdall then expressed concern about the metallic container in the white sack. Defendant removed the container from the sack and explained that it contained denatured alcohol, which he used for his job at a company that manufactured fertilizer. Van Arsdall then asked defendant for consent to search the vehicle. Defendant agreed, and, during the search, the officers found acid, lithium batteries, foil, and cold medicine containing pseudoephedrine—all precursor materials for manufacturing methamphetamine.

Defendant was charged with unlawful manufacture of a controlled substance. Before trial, defendant moved to suppress the evidence found in the vehicle, on the ground that Van Arsdall unconstitutionally had extended the scope and duration of the traffic stop by questioning him without reasonable suspicion that a crime had been or was being committed. The trial court concluded that Van Arsdall did not have reasonable suspicion to request to search the vehicle. However, the trial court found that defendant's consent to

search was voluntary and that Van Arsdall's request for consent did not extend the duration of the stop. The trial court therefore denied defendant's motion to suppress, and defendant was convicted.

Defendant appealed, and the Court of Appeals reversed and remanded. That court concluded that Van Arsdall had extended the traffic stop beyond a reasonable time when he asked defendant about the containers instead of issuing a traffic citation. The Court of Appeals noted that Van Arsdall's questions had been unrelated to the traffic infraction. Because Van Arsdall had lacked reasonable suspicion to extend the stop, the Court of Appeals concluded that defendant's consent was the product of an unlawful seizure under Article I, section 9, and that the evidence discovered in the search of the vehicle therefore should have been suppressed. *Rodgers*, 219 Or App at 374.

B. *State v. Kirkeby*

A deputy sheriff who knew defendant by sight and knew that his driver license had been suspended saw defendant driving with a passenger in downtown Willamina. The deputy contacted his dispatcher, who confirmed that defendant had a suspended license but otherwise had no outstanding arrest warrants. Based on that information, the deputy activated his overhead lights—which remained on throughout the duration of the stop—and stopped defendant. Both defendant and the deputy got out of their respective vehicles and walked toward one another. The passenger remained in defendant's vehicle. The deputy was concerned for his safety, because defendant had left his vehicle. When the deputy told defendant the reason for the stop, defendant seemed surprised and handed the deputy an Oregon driver license. Defendant was cooperative and businesslike, and he did not act in a threatening or aggressive manner. Also, throughout the deputy's extensive history of prior contacts with defendant, defendant never had acted in a threatening or violent manner and never had displayed a weapon. At that point, the deputy had defendant's name, date of birth, and driver license number, which was all the information necessary to complete a traffic citation. However, the deputy testified that he probably did not have all the information that he needed

because he did not have the vehicle registration and proof of insurance.

The deputy told defendant that the license was "no good" and asked him if he had any weapons on his person or in the vehicle. Defendant stated that he did not have any weapons. The deputy then asked for consent to conduct a pat-down, and defendant agreed. At some point, two additional officers arrived and observed the passenger while the deputy talked with defendant. After the patdown of defendant, the deputy felt fairly confident that defendant did not have any firearms on his person, but nonetheless asked for consent to examine each of the items that he had felt in defendant's pockets, because he did not know what they were and wanted to investigate further. Defendant consented. The deputy testified that defendant was not free to leave at that time. The deputy, with defendant's further consent, opened a small metal cylindrical container that he had found during the patdown and discovered two ziplock bags containing a residual amount of a clear crystalline substance that appeared to be methamphetamine. By that time, four to five minutes had elapsed since the beginning of the stop.

Defendant was charged with possession of a controlled substance. Before trial, defendant moved to suppress the evidence obtained during the patdown search. He acknowledged that questions concerning the presence of weapons may be authorized under ORS 810.410(3)(d), set out *post*, 347 Or at 619-20 n 3. However, defendant argued that, unless the officer has "a reasonable suspicion of an immediate threat of serious injury," such questioning—including asking for permission to search for weapons—constituted an unlawful seizure in violation of Article I, section 9, and the Fourth Amendment to the United States Constitution. The trial court granted defendant's motion. The court concluded that the deputy's request to conduct a patdown had not violated ORS 810.410; however, the trial court further concluded that that request had violated Article I, section 9, because the patdown had gone beyond "ordinary social intercourse" and therefore had amounted to a seizure of defendant without reasonable suspicion that defendant either posed a danger to the deputy or others, or had committed a crime.

The state appealed, and the Court of Appeals affirmed, determining that the outcome was controlled by its decision in *Rodgers*. The Court of Appeals noted that, at the time that the deputy asked for consent to conduct a patdown, the deputy was not waiting for further information or otherwise prevented from completing the traffic stop; that is, instead of asking defendant for his vehicle registration and proof of insurance, the deputy had proceeded down an unrelated path. The court further determined that, under *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), the consensual search was the product of unlawful police conduct, because defendant had shown that, if not for the unlawful seizure, the deputy would not have been in a position to request consent, and the state for its part had not shown that intervening circumstances or factors had severed the connection between the unlawful stop and defendant's consent. Therefore, the Court of Appeals concluded the trial court properly suppressed the evidence found in the container. *Kirkeby*, 220 Or App at 187.

C. *Petitions for Review—Parties' Arguments*

The state petitioned for review in both cases. On review, the state argues that the Court of Appeals "refused to engage in what is necessarily a fact-specific inquiry into the reasonableness of the totality of [each] encounter." The state contends that, instead, the Court of Appeals adopted a bright-line rule that will require police officers to follow a predetermined list of investigative steps, thereby imposing an artificial and unnecessary restriction on officers that is "in no manner compelled" by the protection against *unreasonable* seizures set out in Article I, section 9. The state concedes that the questioning here was unrelated to the traffic violations for which defendants were stopped and that the officers lacked reasonable suspicion to act on what they saw. However, the state asserts that the questions that the officers asked were of the same variety that this court has held to be permissible in officer-citizen encounters, without amounting to seizures under Article I, section 9. *See State v. Holmes*, 311 Or 400, 410, 813 P2d 28 (1991) ("[L]aw enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called

upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful."). The state also asserts that this court already has rejected the premise that an officer may never ask questions unrelated to the stop itself, citing *State v. Amaya*, 336 Or 616, 626, 89 P3d 1163 (2004) ("To the extent that defendant argues that *every* question by an officer that is unrelated to the reason for a valid traffic stop violates Article I, section 9, unless the question is based on reasonable suspicion, we reject defendant's argument." (emphasis in original)).

The state acknowledges that, in the context of a lawful traffic stop, the police will have "stopped" the motorist to question him or her about a traffic violation. Therefore, the state argues, the question becomes whether an officer is entitled to ask questions, including seeking consent to search, without effecting an unreasonable seizure under Article I, section 9. Focusing on the scope and length of the questioning at issue, the state proposes a rule that police questioning that is unrelated to a traffic stop, or a request for consent to search during a lawful traffic stop, will not constitute an unconstitutional seizure if that questioning creates only a *de minimis* delay during an otherwise lawful stop. That determination, the state argues, involves a fact-specific inquiry into the totality of the circumstances that can "take into account the many factors that contribute to the determination [of] whether any given circumstance amounts to an unreasonable seizure."

Applying its proposed rule here, the state asserts that, in *Rodgers,* Van Arsdall's questions and request to search defendant's vehicle did not constitute an unreasonable seizure under Article I, section 9, because Van Arsdall posed the same kinds of questions to defendant during the course of the lawful traffic stop that he could have posed to defendant had he approached him on the street. The two questions that Van Arsdall asked about the blue liquid and the white sack took only a few moments and caused only a *de minimis* delay. Thus, the state argues, the questions did not render the traffic stop unreasonable in either its length or scope.

Likewise, the state argues that, in *Kirkeby*, the officer's single question about whether defendant had any weapons, followed by a request for consent to conduct a patdown and then a search, did not constitute an unreasonable seizure, because the exchange took only about four to five minutes and the questions could have been asked of any person walking down the street.

In response, defendants assert that the traffic stop itself is a seizure for constitutional purposes. Defendants contrast "mere conversation" between an officer and a person on the street—who freely may end the interaction and walk away—with a traffic stop, where the motorist is legally obligated to stop at an officer's direction, must interact with and respond to officer-initiated inquiries, is not free to end the encounter, and may not leave without the officer's consent. Therefore, defendants argue, Article I, section 9, limits an officer to investigatory questions about the vehicle code violation for which a driver is stopped, unless the officer develops reasonable suspicion or probable cause to believe that the driver has committed, is attempting to commit, or is committing a crime.[2] Defendants argue that the state's proposed rule, which focuses only on the temporal duration of a stop, is unworkable, because too many variables arise in the traffic stop context. For example, defendants argue that traffic stops have no standard length: an experienced officer would be more efficient than an inexperienced officer, while a stop for a more serious traffic infraction could take longer than a stop for a minor infraction.

## II. ANALYSIS

The authority of a police officer to stop a vehicle for a traffic violation is governed by ORS 810.410.[3] The statute has

---

[2] Defendant Kirkeby no longer asserts, as he did to the trial court, that the officer's initial question about the presence of weapons constituted a seizure under Article I, section 9. We express no opinion on that issue.

[3] ORS 810.410 provides, in part:

"(2) A police officer may issue a citation to a person for a traffic violation at any place within or outside the jurisdictional authority of the governmental unit by which the police officer is authorized to act:

"(a) When the traffic violation is committed in the police officer's presence; or

a long history in this court. Before 1997, this court, in a series of cases, held that the statute not only described what an officer could do respecting a traffic stop; it also indicated what the officer could not do. *See, e.g., State v. Porter*, 312 Or 112, 120, 817 P2d 1306 (1991) ("* * * [B]y implication, the statute proscribes any further action by the police [beyond that specifically authorized] * * *, unless [that further action] has some basis other than the traffic infraction."). *See also State v. Farley*, 308 Or 91, 94-95, 775 P2d 835 (1989); *State v. Dominguez-Martinez*, 321 Or 206, 212, 895 P2d 306 (1995) (both to same effect). This court held that, because the statute was intended to limit police activity associated with a traffic stop, it was also the legislature's intention that evidence seized in violation of the statutory proscription be suppressed. *Porter*, 312 Or at 121; *Dominguez-Martinez*, 321 Or at 214.

The foregoing interpretations of legislative intent were superseded by the legislature in 1997. In that year's legislative session, the legislature enacted ORS 136.432. That statute provides, in part:

"(b) When the police officer has probable cause to believe an offense has occurred based on a description of the vehicle or other information received from a police officer who observed the traffic violation.

"(3) A police officer:

"(a) Shall not arrest a person for a traffic violation.

"(b) May stop and detain a person for a traffic violation for the purposes of investigation reasonably related to the traffic violation, identification and issuance of citation.

"(c) May make an inquiry into circumstances arising during the course of a detention and investigation under paragraph (b) of this subsection that give rise to a reasonable suspicion of criminal activity.

"(d) May make an inquiry to ensure the safety of the officer, the person stopped or other persons present, including an inquiry regarding the presence of weapons.

"(e) May request consent to search in relation to the circumstances referred to in paragraph (c) of this subsection or to search for items of evidence otherwise subject to search or seizure under ORS 133.535.

"(f) May use the degree of force reasonably necessary to make the stop and ensure the safety of the peace officer, the person stopped or other persons present.

"(g) May make an arrest of a person as authorized by ORS 133.310 (2) if the person is stopped and detained pursuant to the authority of this section."

Paragraphs (c), (d), (e), and (f) of subsection (3) were added in 1997. Or Laws 1997, ch 866, §§ 4, 5.

"A court may not exclude relevant and otherwise admissible evidence in a criminal action on the grounds that it was obtained in violation of any statutory provision unless exclusion of the evidence is required by:

"(1) The United States Constitution or the Oregon Constitution[.]"

ORS 136.432 prohibits the judicial branch from excluding evidence obtained by government conduct that exceeds statutory authority. Thus, although the legislature has continued to circumscribe the authority of the police in ORS 810.410—requiring that, during a traffic stop, police investigatory conduct be reasonably related to the traffic violation, the identification (of persons), and the issuance of a citation—any evidence that is obtained when the police exceed that authority is not suppressible unless it violates some constitutional rule. We turn to a determination whether there is such a constitutional rule.

■ Article I, section 9, of the Oregon Constitution establishes a right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure." Among the potentially "infinite variety of encounters between law enforcement officers and citizens," *Holmes*, 311 Or at 406, this court has identified three general categories of encounters and described whether or when those encounters implicate the protections afforded to individuals under Article I, section 9. *Id.* at 406-07. First, "mere conversation" or a "noncoercive encounter" between an officer and a citizen that involves no restraint of liberty requires no justification and does not implicate the liberty protections provided in Article I, section 9. Second, a temporary restraint of a person's liberty for the purpose of criminal investigation—*i.e.*, a "stop"—qualifies as a "seizure," under Article I, section 9, and must be justified by a reasonable suspicion of criminal activity. Third, an arrest also is a "seizure," under Article I, section 9, and that degree of restraint must be justified by probable cause to believe that the person arrested has committed a crime. *Id.* at 407.

■ A person is "seized" under Article I, section 9, when either (1) a police officer intentionally and significantly interferes with the person's freedom of movement; or (2) the person believes, in an objectively reasonable manner, that his or

her liberty of movement has been so restricted. *Id*. at 409-10. That determination requires a "fact-specific inquiry into the totality of the circumstances of the particular case." *Id*. at 408.

As noted, the state acknowledges that, in the context of a lawful traffic stop, the police have "stopped" the driver and any passengers in a vehicle. The state also concedes that the police inquiries at issue in these cases were unrelated to the reasons for which defendants were stopped (that is, for traffic violations) and that the officers lacked reasonable suspicion that crimes (as opposed to those traffic violations) had been or were being committed before the inquiries were made. However, the state asserts that the essential question is whether, notwithstanding the fact of the traffic stop, an officer may make the kinds of inquiries that were made in these cases without violating the liberty interests protected by Article I, section 9. That argument proceeds from the premise that the police inquiries in these cases were of the same variety that this court held in *Holmes* would be permissible in any police-citizen encounter. That is, the state relies on this court's observation in *Holmes* that police officers may approach persons on the street or in public places, question them, and even accompany them to another location without the encounter necessarily resulting in a seizure under Article I, section 9. And, as this court further explained, that principle may carry over to police-driver interactions. *Id*. at 409-11.

■ In our view, the state's assertion—that police may make unrelated inquiries (including requests to search a person or vehicle) during the course of a traffic stop without implicating Article I, section 9—is correct in the sense that verbal inquiries are not searches and seizures. That is, we agree that police inquiries during the course of a traffic stop (including requests to search a person or vehicle) are not searches and seizures and thus by themselves ordinarily do not implicate Article I, section 9. However, police conduct that involves physical restraint or a show of authority that restricts an individual's freedom of movement typically does implicate Article I, section 9.

Nevertheless, in contrast to a person on the street, who may unilaterally end an officer-citizen encounter at any

time, the reality is that a motorist stopped for a traffic infraction is legally obligated to stop at an officer's direction, *see* ORS 811.535 (failing to obey a police officer) and ORS 811.540 (fleeing or attempting to elude a police officer), and to interact with the officer, *see* ORS 807.570 (failure to carry or present license) and ORS 807.620 (giving false information to a police officer), and therefore is not free unilaterally to end the encounter and leave whenever he or she chooses. Moreover, an officer ordinarily cannot casually "approach" a moving vehicle on the road in the same way that an officer may approach a person on the street. It follows that a traffic stop by its nature is not an ordinary police-citizen "encounter," as the court described such encounters in *Holmes*.

██ Moreover, if the purpose of a traffic stop is to investigate crime, evidence gained from the stop must be obtained in compliance with Article I, section 9. *See State v. Anderson*, 304 Or 139, 141, 743 P2d 715 (1987) (criminal sanctions were intended consequence of sobriety roadblock; thus, where officers had neither warrant nor individualized suspicion that defendant was engaged in illegal activity, evidence gained from roadblock must be suppressed). Seizures or searches for evidence to be used in a criminal prosecution, conducted without a warrant or without an exception to the warrant requirement, violate Article I, section 9, of the Oregon Constitution. *Nelson v. Lane County*, 304 Or 97, 101, 743 P2d 692 (1987) (plurality opinion).

██ In summary, Article I, section 9, and this court's case law establish the following principles that must guide the police in their contact with motorists stopped for routine noncriminal traffic violations. Police authority to perform a traffic stop arises out of the facts that created probable cause to believe that there has been unlawful, noncriminal activity, *viz.*, a traffic infraction. Police authority to detain a motorist dissipates when the investigation reasonably related to that traffic infraction, the identification of persons, and the issuance of a citation (if any) is completed or reasonably should be completed. Other or further conduct by the police, beyond that reasonably related to the traffic violation, must be *justified* on some basis other than the traffic violation.

 To put the matter another way, constitutionally, Article I, section 9, protects persons and effects from unreasonable searches and seizures by requiring a judicially authorized warrant supported by probable cause authorizing a search or seizure. There are, however, certain limited exceptions to the warrant and probable cause requirements. One such exception permits the police to stop and briefly detain motorists *for investigation of noncriminal traffic violations.* Police conduct during a noncriminal traffic stop does not further implicate Article I, section 9, so long as the detention is limited and the police conduct is reasonably related to the investigation of the noncriminal traffic violation. However, a police search of an individual or a vehicle during the investigation of a noncriminal traffic violation, without probable cause and either a warrant or an exception to the warrant requirement, violates Article I, section 9. Because police inquiries during a traffic stop are neither searches nor seizures, police inquiries in and of themselves require no justification and do not necessarily implicate Article I, section 9. However, police inquiries unrelated to a traffic violation, when combined with physical restraint or a police show of authority, may result in a restriction of personal freedom that violates Article I, section 9.

It is within that framework that this court now must decide whether the police conduct in these cases, conceded by the state to be unrelated to the investigation of a traffic violation, transgressed the limits of Article I, section 9, resulting in an unlawful seizure and, if so, whether the evidence seized by the police in each case should be suppressed because it is a product of an unlawful seizure.[4]

---

[4] We reject the state's argument that this court's decision in *State v. Jackson,* 296 Or 430, 677 P2d 21 (1984), stands for the rule that a *de minimis* delay during a traffic violation investigation does not, under *any* circumstances, violate an individual's right to be free from unreasonable searches and seizures under Article I, section 9. In that case, during a valid traffic stop, the officer walked from the driver's side to the passenger side of the defendant's van, shined a flashlight through the window, and saw open beer containers. This court stated that the delay caused by the officer in walking around the van was "*de minimis*" and did not constitute a violation of Oregon statute, nor violate any state or federal constitutional right. However, the court continued,

"Were the defendant to prevail here, an interpretation of the Court of Appeals standard would seem to dictate that once an officer returns an operator's

In doing so, we consider the totality of the circumstances, and we are bound by the trial courts' findings of historical fact, to the extent that those findings are supported by evidence in the record. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). However, this court determines *de novo* whether the trial courts applied the legal principles involved here correctly to those facts. *Id*.

In evaluating the totality of the circumstances, we believe that two cases should serve as guideposts. The first is *State v. Juarez-Godinez*, 326 Or 1, 942 P2d 772 (1997). In that case, this court observed that, for purposes of Article I, section 9, interference with a person's freedom of movement may take the form of either physical force or a show of authority. *Id*. at 6.

The second guidepost is *State v. Toevs*, 327 Or 525, 531, 964 P2d 1007 (1998). In that case, police officers stopped the defendant for driving at night without the use of headlights. After running a records check and instructing the defendant to turn on his lights, the officer advised the defendant that he was free to go. *Id*. at 529. After making that statement, however, the officer immediately asked the defendant for his consent to search the vehicle and questioned the defendant about whether he was carrying any illegal drugs. *Id*. The defendant initially withheld his consent to a search; however, after further questioning, he admitted to the officer that he was in possession of drugs.

In concluding that the traffic stop had ended and that the police officer's subsequent questioning and repeated requests for consent to search resulted in defendant's seizure, the court stated:

license to the driver of a stopped vehicle, he or she must execute an abrupt about-face and march directly back to the police vehicle. Such an interpretation would not be reasonable. An officer who has lawfully stopped a vehicle *does not violate any occupant's rights in walking around the vehicle and looking through the windows of the vehicle to observe that which can be plainly seen*."

*Id*. at 438 (emphasis added). The key of that holding was not the duration of the stop and detention, but the fact that the officer observed evidence of a crime from a lawful vantage point outside the car before conducting further investigation. Unlike the circumstances in these cases, the officer in *Jackson* did not question the defendant about anything unrelated to the reason for the stop until he observed evidence of criminal activity, as required under Article I, section 9.

> "Under the totality of the circumstances, we conclude that a reasonable person in defendant's position could have believed that the officers significantly had restricted his liberty or freedom of movement. Indeed, the officers' continuous show of police authority constituted conduct that was 'significantly beyond that accepted in ordinary social intercourse.' *Holmes*, 311 Or at 410. Therefore, through that conduct, they continued to detain defendant. *See State v. Painter*, 296 Or 422, 425, 676 P2d 309 (1984) ('[A] show of authority may suffice to convert a police-citizen encounter into a "stop" of statutory proportion.').
>
> "The state contends that, because Smith told defendant that he was free to go, the traffic stop ended before Smith began questioning defendant about possessing drugs. It is true that, when an officer tells a driver that he or she is free to go, that factor certainly can weigh in favor of concluding that a traffic stop indeed had ended. However, our case law demonstrates that, when viewing the totality of the circumstances, an officer's *conduct* after stating that a driver is free to go may *negate* such a statement."

*Toevs*, 327 Or at 536-37 (brackets and emphases in original).

■ As previously noted, in defendant Rodgers's case, when Van Arsdall returned to defendant's driver-side window, he had all the information necessary to issue defendant a citation and end defendant's limited detention. Although Van Arsdall chose not to issue the citation at that time, his authority to detain defendant evaporated from that point, because Van Arsdall had completed the investigation reasonably related to the traffic infraction and issuance of the citation. Van Arsdall did not advise defendant in any way that the traffic stop was at an end. The inquiries regarding the items in the car and the request to search occurred after Van Arsdall had completed the traffic violation investigation, and were made by Van Arsdall from the driver-side window while Officer Kantola was stationed on the passenger side of the car. Defendant was not informed that he was free to go, and thus he had no way of knowing that Van Arsdall's questions and request to search the car were not part of the traffic investigation and that his cooperation in Van Arsdall's investigation was not required to continue.

Under the totality of the circumstances, we conclude that Van Arsdall's position at the driver-side window and Kantola's presence on the passenger side of the car was a sufficient "show of authority" that, in combination with the unrelated questions concerning the items in the car and the request to search the car, resulted in a significant restriction of defendant's freedom of movement. *See Toevs*, 327 Or at 536-37 ("[O]fficers' continuous show of police authority constituted conduct that 'was significantly beyond that accepted in ordinary social intercourse.' " (quoting *Holmes*, 311 Or at 410)). *See Dominguez-Martinez*, 321 Or at 213 (officer who told defendant that he was free to go while leaning on open door of defendant's vehicle continued to detain defendant). Because that conduct occurred after completion of the investigation of the traffic violation and because (as the state has conceded) Van Arsdall did not have a reasonable suspicion of criminal activity that justified defendant Rodgers's continued detention, we conclude that defendant Rodgers was unlawfully seized in violation of Article I, section 9.[5]

In *Kirkeby*, the deputy lawfully stopped defendant for the traffic violation of driving with a suspended license. Defendant was well-known to the deputy and was cooperative and "businesslike" during the encounter. After defendant gave the deputy his driver license, the deputy had defendant's name, date of birth, and driver license number. The deputy acknowledged that that was all the information that would be contained on a traffic citation; however, he testified that he "probably" did not have everything he needed to issue the citation, because he had not requested and received from defendant the vehicle registration and proof of insurance. The deputy apparently did not ask any other questions of that kind, however. Instead, because defendant had left his car and the deputy was concerned for his safety, he asked whether defendant had any weapons. (Again, we emphasize that defendant does not assert on review that the deputy's

---

[5] We emphasize that the restriction of movement that implicates Article I, section 9, in both of these cases occurred after the police officers had completed their investigations reasonably related to the traffic infraction and issuance of the citation. We express no opinion about the effect of unrelated police inquiries that occur during the course of the traffic violation investigation and that do not result in any further restriction of movement of the individual.

initial question about the presence of weapons constituted a seizure under Article I, section 9.) Defendant responded in the negative, and the state concedes that nothing else gave rise to a reasonable suspicion of criminal activity. However, instead of then either issuing a traffic citation or asking for insurance information, the deputy asked defendant for consent to conduct a patdown and, following the patdown, asked for defendant's consent to examine each of the items that he had felt in defendant's pockets. The deputy did so, even though he was confident defendant did not have any firearms on his person and had no reasonable suspicion that the items in defendant's pockets were contraband or evidence of a crime. And, as the deputy acknowledged, at the time that he asked defendant for permission to conduct a patdown and to examine the contents of defendant's pockets, defendant was not free to leave.

Based on the totality of the circumstances, we conclude that the deputy's show of authority that accompanied his request that defendant consent to a patdown and subsequent request that defendant consent to an examination of the contents of defendant's pockets occurred after the point that defendant should have been issued a citation or sent on his way. Because the deputy's further detention of defendant was a significant limitation on defendant's freedom of movement and was not justified by reasonable suspicion of criminal activity, defendant Kirkeby was unlawfully seized in violation of Article I, section 9.

Having concluded that each defendant was unlawfully seized in violation of Article I, section 9, we now must determine the effect of that illegality on the admissibility of the evidence obtained from the consensual search that occurred in each case.

■■ ■ In *Hall*, this court acknowledged that there are two related but distinct ways that a violation of a defendant's rights under Article I, section 9, may affect the validity of a defendant's subsequent consent to a search. First, illegal police conduct may negate a defendant's consent to a search, on the ground that the police conduct rendered defendant's consent involuntary. Second, Article I, section 9, may require the exclusion of evidence because a defendant's consent was

derived from, or was the product of, the prior police illegality. In each of these cases, defendants contend only that their consent to search was derived from, or was the product of, the illegal seizure. The methodology for determining whether the state obtained evidence that should be suppressed because it had been obtained in violation of Article I, section 9, was first explained in *State v. Johnson*, 335 Or 511, 520-21, 73 P3d 282 (2003), and then summarized in *Hall*:

> "After a defendant shows a minimal factual nexus between unlawful police conduct and the defendant's consent, then the state has the burden to prove that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct. Deciding whether the state has satisfied that burden requires a fact-specific inquiry into the totality of the circumstances to determine the nature of the causal connection between the unlawful police conduct and the defendant's consent. A causal connection requiring suppression may exist because the police sought the defendant's consent solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct. * * * Although determining the existence of such a causal connection requires examination of the specific facts at issue in a particular case, we view several considerations to be relevant to that determination, including (1) the temporal proximity between the unlawful police conduct and the defendant's consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances—such as, for example, a police officer informing the defendant of the right to refuse consent—that mitigated the effect of the unlawful police conduct."

*Hall*, 339 Or at 34-35.[6]

Here, both defendants have shown the required nexus. In both cases the officers had completed the traffic

---

[6] The dissent apparently agrees that the police conduct in each of these cases resulted in an unlawful seizure of each defendant in violation of Article I, section 9. However, the dissent refuses to follow the exclusionary rule methodology approved just five years ago by the court in *Hall*. Instead, the dissent retraces this court's cases involving the scope and application of the exclusionary rule that led up to this court's decision in *Hall*. The competing theories and arguments regarding the application of the exclusionary rule had their origins in many of the cases that the dissent reexamines. It is, however, undisputed that the cases to which the dissent refers were thoroughly considered and analyzed in *Hall*. Thus, the matter is a settled one.

violation investigation and should have either issued a citation or informed each defendant that they could leave. As already explained, the officers in each case did neither and instead unlawfully detained each defendant. It was during the period of unlawful detention that the officers requested that each defendant consent to a search. Here, as in *Hall*, neither defendant spontaneously granted the officers consent to search; instead, each defendant gave his consent in response to the officers' requests. The state does not advance any argument to this court to satisfy its burden under *Hall* that intervening circumstances or factors severed the connection between the unlawful seizures and defendants' consent. Thus, as in *Hall*, given the temporal proximity between the illegal detention and each defendant's consent, and in the absence of any other intervening circumstances, or other circumstances mitigating the effect of the unlawful seizures of each defendant, we conclude that each defendant's consent, even if voluntary, was the product of police conduct that violated Article I, section 9. Because the consent to search in each case was a product of the unlawful seizure, the evidence obtained during the search, in both cases, must be suppressed.

In *State v. Michael K. Rodgers*, S056239, the decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings. In *State v. Anthony Douglas Kirkeby*, S056237, the decision of the Court of Appeals and the judgment of the circuit court are affirmed.

**GILLETTE, J.,** concurring.

I concur in the analysis and conclusions of the lead opinion, including its reliance on *State v. Hall*, 339 Or 7, 115 P3d 908 (2005). I do so for a reason sufficiently important (at least to me) that I choose to state it separately.

In *Hall*, a majority of this court announced the rule of law that we apply today. Justice Durham offered a spirited and extensive dissent from that rule, *id.* at 37-52 (Durham, J., dissenting), which I found persuasive. I therefore joined it. In the present cases, the dissent makes the same analytical and interpretive points that were made in the *Hall* dissent.

Were we writing on a clean slate, I might still find that message persuasive. But we are not writing on a clean slate. The dissent's points, therefore, are—for me—an echo of an argument fairly waged, but lost. The spirit—the idea—of *stare decisis* calls for us to accept *Hall*, get behind it, and make it work. I understand that others feel differently (as they have every right to do) but I hear that call. I therefore join the lead opinion. *See North Carolina v. Pearce*, 395 US 711, 744-45, 89 S Ct 2072, 23 L Ed 2d 656 (1969) (Harlan, J., concurring in part and dissenting in part) (explaining a similar approach).

**DURHAM, J.,** dissenting.

The question that these cases pose is straightforward: Did the police officers conduct unreasonable searches in violation of Article I, section 9, of the Oregon Constitution, when they (1) searched defendant Rodgers's car, (2) conducted a patdown search of defendant Kirkeby, and (3) opened a metal container discovered in Kirkeby's pocket during the patdown? Each of those searches yielded drug-related evidence.

In my view, those searches were not unreasonable and, thus, did not violate Article I, section 9. My reason for that conclusion is equally straightforward, although it virtually disappears from the majority's analysis: *Before searching, the police requested and obtained each defendant's voluntary consent to the proposed search. The record confirms that the officers scrupulously conducted each search within the scope of the voluntary consent that each defendant had granted to them.* Those facts are undisputed.

The upshot of those facts is that defendants voluntarily gave up any privacy interest in the areas searched, and the police lawfully observed and seized the drug-related evidence that the searches brought to light. Defendants simply defy logic in contending that the searches were unreasonable and unconstitutional, even though they voluntarily consented to each search before it occurred.[1]

_____

[1] The majority, in reciting the pertinent facts, indicates that the searches in these cases occurred after each defendant gave "consent." I assume that, in using that description, the majority is confirming that each defendant gave the voluntary consent that our case law requires. *See State v. Quinn*, 290 Or 383, 394, 623 P2d 630 (1981) (stating standard and upholding trial court's findings that "consent to search was knowingly and voluntarily given").

The majority, however, agrees with and adopts defendants' logic. In doing so, the majority recites several broad—and, for the most part, unhelpful—principles of search and seizure law, which I discuss below, but fails to apply the correct legal principles that, in fact, govern the disposition of these cases.

The majority's result undermines ORS 136.432, which prohibits Oregon courts from ordering the suppression of relevant evidence for reasons that do not rise to the level of an invasion of constitutional rights (aside from the law of privileges, hearsay, and the rights of the press).[2] The majority's result also will confuse the members of the law enforcement community about the practical efficacy of a heretofore valuable tool in roadside encounters: the consent search. Finally, the majority's rationale creates needless confusion regarding the law that governs searches and seizures under the Oregon Constitution. Those negative consequences are both unnecessary and avoidable, for reasons that I explain below.

ORS 136.432 sets the stage for any discussion of defendants' motions to suppress evidence. Under that provision, a criminal defendant cannot obtain suppression of

---

My own review of the record indicates that defendants voluntarily consented to the searches that the police conducted in each case. In *Rodgers*, the trial court expressly found that defendant's consent to the search of his car was voluntary.

In *Kirkeby*, the deputy testified that defendant consented to the patdown search of defendant's clothing and also consented to the opening of the metal container discovered during the patdown. The trial court in *Kirkeby* found the facts to be "as the officer testified today." The officer's testimony generally indicated that defendant's consent to the requested searches was voluntary. The trial court in *Kirkeby* also determined that the deputy "did not have reasonable suspicion for his safety," and thus, he had no justification to request a patdown search of defendant's clothing. That view of the deputy's authority to request a search does not undermine the court's implicit determination, consistent with the deputy's testimony, that defendant's consent to the requested search was voluntary.

[2] ORS 136.432 provides:

"A court may not exclude relevant and otherwise admissible evidence in a criminal action on the grounds that it was obtained in violation of any statutory provision unless exclusion of the evidence is required by:

"(1) The United States Constitution or the Oregon Constitution;

"(2) The rules of evidence governing privileges and the admission of hearsay; or

"(3) The rights of the press."

evidence obtained through police conduct that exceeds the *statutory* authority of the police. ORS 136.432 effectively supersedes this court's decision in *State v. Valdez*, 277 Or 621, 561 P2d 1006 (1977), in which this court upheld the trial court's sanction of exclusion of evidence where police had obtained the evidence in violation of their statutory authority. The relevant inquiry here, therefore, is whether the police obtained the evidence that defendants seek to suppress by conducting searches that violated Article I, section 9.

Article I, section 9, provides, in part:

> "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure * * *."

Under that provision, warrantless searches are *per se* unreasonable, subject to a few well-recognized exceptions, such as searches conducted following a voluntary consent. As explained in *State v. Paulson*, 313 Or 346, 351-52, 833 P2d 1278 (1992):

> "A warrantless search by the police is 'reasonable' under Article I, section 9, when the search falls into one or another of the recognized exceptions to the warrant requirement. *State v. Miller*, 300 Or 203, 225, 709 P2d 225 (1985), *cert den* 475 US 1141 (1986). One such exception is *consent*. 'When there is consent to a search, no warrant is necessary.' *State v. Pogue*, 243 Or 163, 164, 412 P2d 28 (1966)."

(Emphasis in original.)

Courts regard a consent search or seizure as an "exception" to the prohibition on unreasonable search and seizure for good reason, even though the constitutional text does not refer to consent. In Oregon, the people control the right to the security and privacy that Article I, section 9, protects. If a state agent wishes to examine a person's pockets, automobile, briefcase, or other area that Article I, section 9, protects, the person is free to grant or withhold consent. But if the person voluntarily grants consent to a search or seizure, courts recognize that it is virtually impossible, certainly from the standpoint of logic, to conclude that the resulting search or seizure is "unreasonable." Our courts do not sit to stubbornly insist on maintaining the privacy of a person's

property, and to suppress its admission as evidence in court, after the person himself or herself has voluntarily consented to its disclosure to the police.

We must bear in mind the particular interests that Article I, section 9, protects and the particular actions by a state actor to which that provision pertains.

"Article I, section 9, protects privacy and possessory interests. A 'search' occurs when a person's privacy interests are invaded.

"* * * * *

"* * * A 'seizure' [of property] occurs when there is a significant interference with a person's possessory or ownership interests in property."

*State v. Owens*, 302 Or 196, 206-07, 729 P2d 524 (1986). Unquestionably, the police in this case "searched for" and "seized" property from defendants after obtaining their consent. The dispute here is whether the searches and seizures of items of property in Rodgers's car and in Kirkeby's pocket unlawfully deprived defendants of their constitutional privacy and possessory interests in the seized property despite defendants' voluntary consent to the searches.

The majority concludes that the police exceeded their statutory authority when they detained defendants by questioning them in a manner unrelated to any traffic violation. Those unlawful detentions, according to the majority, also were unconstitutional "seizures" under Article I, section 9, because they deprived defendants of their freedom of movement without lawful justification.

The police, however, did not obtain the evidence that is in dispute here simply by detaining defendants after the traffic stops should have ended. In constitutional terms, defendants' right to personal freedom of movement and their right to the privacy of their property are distinct constitutional interests that merit independent examination when asserted against intrusive police conduct. As this court has stated,

"Not all governmental intrusions trigger the protections guaranteed by Article I, section 9, of the Oregon

Constitution. *State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986). Thus, in determining whether a particular governmental action violates Article I, section 9, of the Oregon Constitution, we first must decide whether the action is either a 'search' or a 'seizure' within the meaning of that section."

*State v. Juarez-Godinez*, 326 Or 1, 5, 942 P2d 772 (1997) (footnote omitted).

*Juarez-Godinez* illustrates this court's insistence on a separate examination of a driver's distinct interests in his personal liberty and the privacy of his property in the context of a traffic stop. In that case, Trooper Burdick stopped a car driven by the defendant, who was accompanied by two passengers, for exceeding the maximum speed limit. Fifteen minutes later, Burdick arrested the defendant for failure to display a valid driver's license, placed him in a patrol car, and asked if he could search the car. The defendant refused. The court summarized the legal effect of those actions as follows:

"Indisputably, defendant had been placed under arrest. As a consequence of that arrest, defendant was unable to drive the car away himself. Still he retained a possessory interest in the car and, in normal circumstances, could have transferred possession of it to one of his passengers and directed that it be driven away. Indeed, Burdick's request that defendant consent to the search at least arguably was a recognition of defendant's possessory interest, and defendant's refusal to allow Burdick to search was an effort to exercise that possessory interest."

*Id.* at 7-8. After detaining the defendant's car, the police searched it and discovered illegal drugs. The court determined that the detention of the car constituted an unconstitutional seizure of the car. The defendant argued that the drug evidence was subject to suppression because the search that brought it to light was the product of several observations of the car by Burdick during the unlawful detention of the car. This court agreed and ordered suppression. *Id.* at 9-10.

*Juarez-Godinez* is helpful in analyzing the instant case. The decision in that case demonstrates that a driver

who has been subjected to a full-custody arrest during a traffic stop, and thus has been deprived of his personal liberty to move about, nevertheless retains a constitutionally protected possessory and privacy interest regarding his property, including his car, at the scene of the stop. That signifies that, despite being under arrest, a driver can choose, in response to a request for consent to search the car or other property, either to insist on a search warrant or to voluntarily consent to the requested search.

This court reached that very conclusion in *State v. Bea*, 318 Or 220, 864 P2d 854 (1993), in which this court upheld the admissibility of evidence seized from an arrestee who voluntarily consented to a search of his person. The court's principal focus in *Bea* was on the *voluntariness* of the arrestee's consent to the search. That was the correct focus.[3] The court examined all the surrounding circumstances, including the fact that the defendant was under arrest, and determined that

> "[t]here is nothing in the record to indicate that the police 'intimidated or coerced [defendant] in any way' in obtaining his consent or that there were any circumstances present that might 'impair [defendant's] capacity to make a knowing, voluntary, and intelligent choice.' Because defendant voluntarily consented to the search, that search did not violate defendant's rights under Article I, section 9."

*Id.* at 230-31 (citations omitted; alterations in original).

The analysis is more complicated, however, when the consent search follows a detention that is unconstitutional. The unlawfulness of an initial detention may create additional pressure on the citizen to consent to a search and,

---

[3] *Bea* also confirmed that the pertinent inquiry under the Fourth Amendment to the United States Constitution is identical to the inquiry under Article I, section 9: Did the arrestee give a voluntary consent to the search that uncovered the disputed evidence? This court, describing the federal rule, stated:

"The mere fact that a defendant is in custody of police officers does not, in itself, demonstrate that a consent to search is coerced. *See United States v. Watson*, 423 US 411, 424, 96 S Ct 820, 46 L Ed 2d 598 (1976) (citing *Schneckloth* [*v. Bustamonte*, 412 US 218, 219, 93 S Ct 2041, 36 L Ed 2d 854 (1973)] in concluding that 'the fact of custody alone has never been enough in itself to demonstrate a coerced * * * consent to search')."

*Bea*, 318 Or at 231-32.

thus, lead to the conclusion that the citizen's consent was not voluntary. *See State v. Kennedy*, 290 Or 493, 502, 624 P2d 99 (1981) ("[T]he burden [of persuasion] on the police to show voluntariness when consent occurs after illegal police conduct is greater than when no illegality has occurred."); *State v. Warner*, 284 Or 147, 585 P2d 681 (1978) (defendant's consent to search, following illegal stop, was not voluntary, given that defendant had been confronted by six officers and three marked police cars).

Apart from the voluntariness inquiry described above, this court will require suppression of evidence obtained following an initial unlawful detention if the evidence is the "fruit of the poisonous tree." *See Warner*, 284 Or at 166, citing *Wong Sun v. United States*, 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963) (discussing "fruit of the poisonous tree" doctrine); *Quinn*, 290 Or at 396-97 (applying *Wong Sun* "fruit of the poisonous tree" doctrine under Oregon Constitution). This court observed in *State v. Hall*, 339 Or 7, 27, 115 P3d 908 (2005), that the *Quinn* decision had not applied the analysis in *Wong Sun* correctly to the facts of that case, and I agree with that conclusion. Except for that misstep, however, this court has applied the "fruit of the poisonous tree" analysis to determine whether police have exploited an initial illegal detention to obtain a defendant's consent to a search. *See State v. Rodriguez*, 317 Or 27, 38, 38 n 11, 854 P2d 399 (1993) (deciding, under Article I, section 9, whether evidence seized pursuant to consent search was " 'fruit' of the unlawful arrest" of the defendant).

The facts in *Wong Sun* illustrate the significance of a defendant's voluntary cooperation with police in a court's subsequent application of the "fruit of the poisonous tree" doctrine. In *Wong Sun*, federal narcotics officers illegally entered a dwelling without probable cause and arrested Toy. Toy made incriminating statements and gave the officers information that led them to two other persons, Yee and Wong Sun. The officers arrested Yee and seized drugs in his possession. The officers also arrested Wong Sun. The court arraigned Toy, Yee, and Wong Sun, and released them on their own recognizance. Within a few days, an officer interrogated Toy and Wong Sun, after advising them of their right to remain silent. They made incriminating statements.

The Court applied the "fruit of the poisonous tree" doctrine to determine whether several distinct types of evidence were subject to suppression because the officers had obtained the evidence in violation of the Fourth Amendment to the United States Constitution. The Court first decided that the officers' entry into Toy's dwelling and subsequent arrest had been unlawful. The Court then concluded that Toy's oral statements to the officers in his home were the fruit of that initial illegality and were subject to suppression. 371 US at 487.

Next, the Court turned to the admissibility of narcotics seized from Yee. The seizure of those drugs was the immediate result of the oral statements by Toy in his home. The Court first determined that the officers had not obtained the drug evidence through any source independent of Toy's declarations. The Court continued:

> " '[N]or is this a case in which the connection between the lawless conduct of the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint.' *Nardone v. United States*, 308 US 338, 341[, 60 S Ct 266, 84 L Ed 307 (1939)]. We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, *Evidence of Guilt*, 221 (1959). We think it clear that the narcotics were 'come at by the exploitation of that illegality' and hence that they may not be used against Toy."

*Id.* at 487-88.

The Court then examined the admissibility of Wong Sun's incriminating statement to the police after his arraignment. The Court agreed that the officers had arrested Wong Sun without probable cause, but decided that his incriminating statement to the officers was not the fruit of the unlawful arrest:

> "We turn now to the case of the other petitioner, Wong Sun. We have no occasion to disagree with the finding of the

Court of Appeals that his arrest, also, was without probable cause or reasonable grounds. At all events no evidentiary consequences turn upon that question. For Wong Sun's unsigned confession was not the fruit of that arrest, and was therefore properly admitted at trial. On the evidence that Wong Sun had been released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make the statement, we hold that the connection between the arrest and the statement had 'become so attenuated as to dissipate the taint.' *Nardone v. United States*, 308 US [at 341]."

*Id.* at 488.

Several useful principles emerge from the analysis used in *Wong Sun*. First, the Court focused specifically on how the police have "come at," or obtained, the challenged evidence. Second, the Court also rejected reliance on a "but for" causal relationship between the primary illegality and a subsequent seizure of evidence. Finally, as the Court's discussion of its conclusion pertaining to defendant Wong Sun discloses, a defendant's voluntary cooperation in providing evidence to the police can dissipate the taint of an earlier police illegality (there, the prior unlawful arrest of Wong Sun), and justify admission of evidence despite the fact that the police would not have obtained it but for earlier illegal actions.

We must apply those principles faithfully in the context of the present cases. The majority posits, and I agree, that the police stops in these cases became unlawful seizures when the officers delayed each driver's release at the conclusion of any traffic-related business. At that point, the officers had no probable cause to conduct any search or seizure of either defendants' property; they had only a suspicion that defendants might possess contraband.

The officers sought each defendant's consent to a search and, in each case, defendants granted voluntary consent to a search. Kirkeby repeatedly granted voluntary consent to the search of his pockets. The resulting searches yielded contraband. In *Wong Sun* terms, the police "came at" the disputed evidence because of the voluntary consent of each defendant to the requested searches. It is true that the

seized contraband in each case has a "but for" causal link to the police stops. However, *Wong Sun* holds that a "but for" relationship between unlawful police conduct and evidence seized afterward is insufficient where later events have dissipated the taint of the earlier illegality.

Under the circumstances shown here, the voluntary consent granted to the police was sufficient to purge the taint of the unlawfully extended police stops. An officer's noncoercive request for consent to search does no more than give a defendant the choice of whether to permit the police to invade his or her privacy interest in the property in question. If a defendant voluntarily consents to a search, any evidence that comes to light during the search owes its discovery to the defendant's decision to consent, not to unilateral searching or seizing activity by the police.

As noted, both the illegality of a defendant's detention and the factual circumstances surrounding a detention can bear on the voluntariness inquiry when police rely on evidence seized following a consent. But voluntariness is not challenged here. Rather, defendants contend that the court must suppress the seized evidence only because each request for consent expanded the scope of each stop, thus effecting an unconstitutional detention. That argument fails because it focuses only on the "but for" relationship between the delayed stops and the evidence seized later, and fails to account for the attenuating effect of the consents to search that actually brought the disputed evidence to light.

This case is unlike *Quinn*, where officers first conducted a search without a warrant or a justification for a warrantless search, discovered the disputed evidence, and later sought and obtained defendant's consent to again look for the same evidence. At that point, the police already had breached defendant's privacy interest in the disputed evidence. I agree that, under those circumstances, the taint of the initial police search was not dissipated by a later consent to search.

The majority reasons that the conduct of the police in *asking* for consent to search was unlawful, because the requests changed the purpose of the detention from a traffic stop to a criminal investigation for which there was no reasonable suspicion of criminal activity. 347 Or at 627-28.

From that premise, the majority concludes that defendants' consents to the requested searches were the product of unlawful police conduct—the extended traffic stops—that placed the officers *in a position to request consent to search.*

An obvious flaw in that reasoning is that it relies on a "but for" causal connection between the delayed stop and the officer's request for consent and avoids any analysis of the correct issues: (1) did defendants voluntarily consent to a search; and (2) if the consents were voluntary, did that fact attenuate the taint of the delayed stop? The majority errs in terminating its analysis based only on the fact that the requests for consent occurred *after* the stops became unlawful and, thus, were the "product" of the extended stops.

The majority's focus on the requests for consent to search is erroneous for another reason. Certain provisions of the Oregon Constitution do restrict the opportunity of police officers to ask questions of a suspect at certain times during a police investigation. For example, the right against self-incrimination in Article I, section 12, of the Oregon Constitution restricts the police from subjecting a suspect to custodial interrogation unless the police first advise the suspect of his rights. *State v. Scott*, 343 Or 195, 203, 166 P3d 525 (2007). A suspect's constitutional right to counsel similarly requires the police to refrain from questioning a suspect once he or she asks for a lawyer. *State v. Charboneau*, 323 Or 38, 54, 913 P2d 308 (1996).

Article I, section 9, prohibits unreasonable "searches" and "seizures." In the context of a consent search, a police request for consent to search is not itself a search and does not invade the privacy of the citizen. Thus, a request for consent is distinguishable from, for example, custodial interrogation, in which the permissibility of police questioning itself is controlled by Article I, section 12.[4] By contrast, courts examine a request for consent under Article I, section 9, to determine whether, based on the totality of the circumstances, the subsequent consent was voluntary. By focusing exclusively on the causal link between the delayed stops and

---

[4] Neither defendant in these cases asserts that the conduct of the police in requesting consent violated any right protected by Article I, section 12.

the officers' requests for consent to search, the majority is able to identify only a "but for" causal link between the traffic stops and defendants' consents to search, and avoid altogether any examination of the voluntariness of defendants' consent.

The majority relies on *State v. Hall* for the conclusion that, in this context, the state must demonstrate that the causal link between an unlawful police detention and any later consent to a search is "severed." *Hall* did not attempt to distinguish, let alone overrule, our cases invoking the correct analytical rule in this circumstance, *i.e.*, the "fruit of the poisonous tree" doctrine.

According to the majority, under *Hall*, a request for a consent to search effects an unlawful stop and is impermissible police conduct, apart from any consideration of the voluntariness of the resulting consent to a search. That reading of *Hall* conflicts with *State v. Amaya*, 336 Or 616, 626, 89 P3d 1163 (2004), in which this court confirmed that a police question that does not relate to an ongoing traffic stop is not unlawful when the question is asked to ensure the safety of the police officer or others. *Hall* does not purport to overrule *Amaya* or resolve that inconsistency.

Finally, *Hall* sought to distinguish two cases, *Kennedy* and *State v. Rodriguez*, in which this court had denied suppression of evidence obtained pursuant to consent during assertedly unlawful police detentions. According to *Hall*, the defendants in those cases consented to searches without police prompting and, in *Rodriguez*, after a reading of *Miranda* rights. 339 Or at 34. But the facts in those cases showed only that the evidence on the record amply supported the conclusion of voluntariness, not that the court, as the majority sees it, could avoid the inquiry into voluntariness altogether by deciding that the detention of the citizen was unlawful.

I dissented from the reasoning and result in *Hall* regarding the consent search in that case. 339 Or at 37 (Durham, J., concurring in part and dissenting in part). The concern that I voiced there—that the majority had created an analytical model for consent searches that our precedents did not support—takes on additional weight because the majority has now extended its *Hall* analysis to the context of traffic

stops, one of the most common police-citizen encounters. The result will be a decline in the safety of traffic-related law enforcement activities and an increase in the suppression of evidence seized from automobiles even though the citizen has granted the police voluntary consent to conduct a search. In my view, *Hall* requires reconsideration.

A traffic stop by a police officer is a limited, but still significant, abridgment of a citizen's freedom to move about in an automobile. A traffic stop may rise to the level of a constitutional seizure if the officer detains the driver, including through questioning, without reasonable grounds. However, if an officer unlawfully detains a driver, and later develops suspicions about property in the car or on the driver's person, the officer commits no invasion of the driver's privacy interest in his or her property by requesting and receiving voluntary consent to search.

The request for consent places the driver and the officer in the same positions that they would have occupied before the unlawful detention, because it affords the driver the choice to decide whether to voluntarily expose the property to police examination through a search. Defendants in these cases made that voluntary choice in favor of allowing the police to search. The unchallenged conclusion that defendants acted voluntarily in consenting confirms, as a matter of logic, that the surrounding circumstances, including the unlawfully extended stop, did not coerce defendants to cooperate with the police by allowing them to search. Consequently, the searches here were not unreasonable under Article I, section 9, and, accordingly, ORS 136.432 prohibits suppression of the evidence in question.

In *State v. Rodgers*, I would reverse the decision of the Court of Appeals and affirm the judgment of the trial court. In *State v. Kirkeby*, I would reverse both the decision of the Court of Appeals and the judgment of the trial court. I dissent from the contrary dispositions ordered by the majority.

Linder, J., joins in this dissenting opinion.