Argued and submitted December 16, 2015; affirmed June 14, 2017

STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

LANCE PAUL NEWTON,
*Defendant-Respondent.*

Josephine County Circuit Court
13CR0381; A157145

398 P3d 390

David B. Thompson, Assistant Attorney General, argued the cause for appellant. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Morgen E. Daniels, Deputy Public Defender, argued the cause for respondent. With her on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Before Duncan, Presiding Judge, and DeVore, Judge, and Flynn, Judge pro tempore.

**FLYNN, J. pro tempore**

The state appeals from a trial court order suppressing evidence that the state obtained after an officer walked up a private driveway late at night and questioned defendant and his girlfriend, who were sitting in a parked van. The state challenges the trial court's conclusion that defendant was stopped for the purposes of Article I, section 9, of the Oregon Constitution at any point before the officer developed reasonable suspicion that defendant had committed a crime. We conclude that the trial court's findings support its conclusion that, under the totality of the circumstances, defendant was stopped after the officer asked defendant to produce identification, asked his girlfriend if she was all right and if she would get out of the van, and then stood behind the van while he questioned defendant's girlfriend and ran a check on defendant's identification. We also conclude that the state did not argue in the trial court that the officer possessed reasonable suspicion of a crime at that point and, thus, decline to reach the unpreserved argument. Accordingly, we affirm.

We review the trial court's ruling on a motion to suppress for legal error. *State v. Maciel-Figueroa*, 361 Or 163, 165-66, 289 P3d 1121 (2017). In conducting that review, "we are bound by the trial court's factual findings if there is any constitutionally sufficient evidence to support them." *Id.* To the extent that the trial court did not make express findings regarding disputed facts, we will presume that the court found the facts in a manner consistent with its ultimate conclusion, provided the evidence would support such findings. *Id.* at 166. We describe the facts in a manner consistent with that standard of review.

## I.  FACTUAL BACKGROUND

In Grants Pass shortly after midnight, a call came in to dispatch from a convenience store employee to report that a woman who was crying and appeared to be intoxicated was seen arguing with a man in a van. The employee described the woman as "hysterical," described the man and the van, and reported that the woman had left in the van with the man driving. Officer Lewelling, responding to

the call, learned that a woman, R, was the van's registered owner and went to her home address.

Lewelling arrived at the house, which was located in a residential neighborhood, "roughly ten minutes after the initial call." He saw the van parked in the private drive-way of the house, with its "nose pointed towards the garage." Lewelling, who was wearing his uniform with a badge, parked his marked police cruiser on the street in a way that did not block the driveway, and he did not turn on his lights or sirens.[1] As he approached the van on foot, Lewelling saw that defendant was sitting in the driver's seat of the van with the window rolled down slightly, and that a woman, R, was sitting in the passenger seat, resting her head on defendant's chest. There was no indication that the two were arguing.

Lewelling could smell the odor of alcohol emanat-ing from the inside of the van. He knocked on the drivers' side window and, using a tone of "concern," Lewelling asked R if she was all right. She responded that she was, and Lewelling noticed that she responded with slurred speech. Lewelling then asked defendant for his name and date of birth. Defendant handed Lewelling his Oregon ID card and, when defendant spoke, Lewelling noticed that "[h]e also had slurred speech."

Lewelling then asked R if she would be willing to "step out of the vehicle and chat" with him, and she agreed. Lewelling stood at the back of the van and "called in" defen-dant's information. Defendant could hear Lewelling speak-ing on "his walky talky behind the van." Lewelling began a conversation with R behind the van and, while the two were talking, Lewelling heard back from his identification check and learned that defendant had a "felony level suspension" of his driver's license. After he concluded his interview with R, including questions about whether defendant had been driving the van, Lewelling went to the driver's side door to

---

[1] Officer Moore arrived shortly after Lewelling contacted defendant. Moore parked behind Lewelling and at some point stood "off to the back corner of the van" during the encounter. The parties do not advance any argument as to how Moore's presence affected the nature of the encounter, and we do not discuss his presence.

contact defendant about the crime of driving a vehicle with a suspended license (DWS), ORS 811.182. Through that additional contact with defendant, Lewelling developed probable cause to arrest defendant for driving under the influence of intoxicants (DUII), ORS 813.010. The state charged defendant with both crimes.

## II. PROCEDURAL BACKGROUND

Prior to trial, defendant filed a motion to suppress. Defendant's initial motion contended that Lewelling arrested him without probable cause. However, during the motion hearing, defendant's attorney became aware of facts that prompted her to ask the trial court for permission to expand the scope of her motion to include an argument that defendant had been stopped without reasonable suspicion at the point that Lewelling called in defendant's name and date of birth to dispatch. The court allowed defense counsel to proceed on this expanded basis and also allowed the parties to submit additional written arguments.

After considering the parties' post-hearing arguments, in which defendant urged the court to conclude that defendant was stopped under the totality of the circumstances, including Lewelling running "defendant's information through dispatch," the trial court granted defendant's motion. The court emphasized that Lewelling was questioning defendant's passenger, R, "behind the vehicle," and found, "at least during the time the passenger was outside the vehicle that the defendant was not free to start the vehicle and leave the driveway if for nothing else the safety of the passenger." Ultimately, the court concluded that, "under the totality of the circumstances," a reasonable person in defendant's position would believe he was being restrained. The court "suppress[ed] the evidence obtained against the defendant as a result of the stop without reasonable suspicion."

On appeal, the state asserts that the trial court "appears to have determined that Lewelling seized defendant for Article I, section 9 purposes at the point he stood with [R] behind the van."[2] The state argues that defendant

---

[2] To the extent that there is ambiguity in the court's opinion regarding the point at which the seizure occurred, we emphasize that defendant accepts the state's interpretation of the court's ruling, and we will as well.

was not stopped at that point and, alternatively, that a stop at that point was supported by reasonable suspicion that defendant had committed the crime of DUII. Defendant disagrees with both arguments. He also contends that the state did not preserve its alternative argument that Lewelling possessed reasonable suspicion of DUII at a point prior to when he recontacted defendant about driving while suspended.

## III. ANALYSIS

Article I, section 9, of the Oregon Constitution protects against unreasonable searches and seizures. A person is "seized" for purposes of that constitutional provision: "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances *would* believe that (a) above has occurred." *State v. Ashbaugh,* 349 Or 297, 316, 244 P3d 360 (2010) (emphasis in original). However, "'[t]here potentially is an infinite variety of encounters between law enforcement officers and citizens[,]' and '[n]ot every such encounter constitutes a "seizure" of the citizen' for constitutional purposes." *State v. Fair,* 353 Or 588, 593, 302 P3d 417 (2013) (quoting *State v. Holmes,* 311 Or 400, 406-07, 813 P2d 28 (1991)). "At one end of the continuum are mere encounters for which no justification is required," while at the other end "are arrests, which involve protracted custodial restraint and require probable cause." *Id.* In the area between those two ends of the continuum lie "temporary detentions for investigatory purposes, often termed 'stops,'" which are seizures for constitutional purposes and generally require reasonable suspicion. *Id.*

A. *General Principles Regarding the Line Between an Encounter and a Seizure*

Unfortunately, "the line between a mere encounter and something that rises to the level of a seizure does not lend itself to easy demarcation." *State v. Backstrand,* 354 Or 392, 399, 313 P3d 1084 (2013) (internal quotation marks omitted). Nevertheless, a series of Supreme Court cases in recent years have sought to provide some definition to the line, and a few guiding principles have evolved

from those cases. The first principle is that any inquiry into whether a particular encounter constitutes a seizure is necessarily "fact-specific and requires an examination of the totality of the circumstances involved." *Id.* The question for the court "is whether the circumstances as a whole transformed the encounter into a seizure," even if the circumstances, individually would not create a seizure. *State v. Anderson*, 354 Or 440, 453, 313 P3d 1113 (2013); *see also State v. Charles*, 263 Or App 578, 585, 331 P3d 1012 (2014) (The "question is whether all of the officer's actions combine to form a whole greater than the sum of its parts.").

Another principle is that "the constitutional concern is with police-imposed restraints on citizen liberty, not with limiting contacts between police and citizens." *Backstrand*, 354 Or at 400. Police officers are "'free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful.'" *Id.* (quoting *Holmes*, 311 Or at 410). In addition, an officer may request a person's identification and may retain the identification long enough to check its validity without those actions, in and of themselves, creating a coercive restraint on the person's liberty.[3] *Id.* at 412-13. As the court reasoned in *Backstrand*, "[a] person who turns over identification to a law enforcement officer reasonably would expect that the officer will take steps to verify its validity. For the officer to do so does not objectively convey an exercise of the officer's authority to restrain the person's liberty or freedom of movement."[4] *Id.*

Ultimately, "something more than just asking a question, requesting information, or seeking an individual's cooperation is required" to transform an encounter between

---

[3] Although *Backstrand* refers to checking a person's identification for "validity," the court seems to have included a check for outstanding warrants in the same category. *Anderson*, 354 Or at 445, 450.

[4] The court's explanation could suggest that the test for a seizure depends on whether the officer's "'show of authority was expected, appropriate, or reasonable,'" but the court has expressly disavowed that approach to the test. *Backstrand*, 354 Or at 416 n 19 (quoting and distinguishing 354 Or at 424 (Walters, J., concurring in the judgment)).

an officer and a citizen into a seizure. *Id* at 403. As the court has explained, "at a minimum, some exercise of coercive authority by the officer, such as retention of the identification after examination and a continuation of investigatory activities, is required." *Id.* at 416. For that constitutionally significant "show of authority" to occur, "[e]xplicitly or implicitly, an officer must convey to the person with whom he is dealing, either by word, action, or both, that the person is not free to terminate the encounter or otherwise go about his or her ordinary affairs." *Id.* at 400. This "'show of authority' can be inferred from 'the content of the questions [asked by a police officer], the manner of asking them, or other actions that police take (along with the circumstances in which they take them).'" *Charles*, 263 Or App at 583 (quoting *Backstrand*, 354 Or at 412) (brackets and parentheses in *Charles*).

B. *Applying the General Principles to This Case*

In this case, the trial court found that several circumstances exist, which constitute the "something more" that transform the encounter into a coercive show of authority: the location of the van on private residential property, the late-night interruption, the investigative focus of Lewelling's inquiries, and Lewelling's physical position in relation to the van. The trial court described this as "a close case," and we agree. However, the trial court's findings regarding Lewelling actions—to which we are bound because they are supported by constitutionally sufficient evidence—describe circumstances that, in combination, transformed the encounter into a seizure of defendant.

1. *Location*

First, the court emphasized that defendant was sitting with R, his girlfriend, in a van that "was parked completely in the driveway" of the R's private residential property. We agree that those circumstances are pertinent considerations. As the Supreme Court has explained, "[t]he degree to which law enforcement conduct intrudes on a citizen's protected interest in privacy and liberty is significantly affected by where the conduct occurs, such as in the home, in an automobile, or on a public street." *Fair*, 353 Or at 600. We emphasize that the location does not, of itself, convert

an otherwise lawful encounter to a seizure, even when the citizen is in his own home. Indeed, we have explained that an officer "may, generally, approach a citizen's front door and knock on it without effecting a seizure." *Charles*, 263 Or App at 584. Nevertheless, Lewelling's willingness to intrude on defendant and R when they sat in R's van in the private driveway of R's private residence has some bearing on whether Lewelling's conduct as a whole amounted to the constitutionally significant "show of authority."

## 2. *Late-night interruption*

We also agree with the trial court that there is some significance to the timing of Lewelling's intrusion on the couple as they sat quietly in R's van. As the Supreme Court explained in *Backstrand*, the seizure inquiry focuses on whether a citizen in the defendant's position would "reasonably believe that the officer is intentionally restraining the citizen's liberty or freedom of movement in a significant way—that is, in a way that exceeds the bounds of ordinary social encounters between private citizens." 354 Or at 400. Thus, the fact that Lewelling entered private property after midnight to knock on the van window and begin questioning the occupants—conduct that the trial court determined to be "significantly beyond that accepted in ordinary social intercourse"—contributes to our conclusion that Lewelling's conduct as a whole constituted a seizure.[5]

The dissent suggests that we should ignore the time of night because Lewelling was responding to a 9-1-1 call from the convenience store. *See* 286 Or App at 292-93 (DeVore, J., dissenting). We disagree. Unlike *Fair*, 353 Or at 599-600, in which the court implied that no seizure occurred when officers first approached the defendant's home in response to an occupant's 9-1-1 "hang-up" call, *i.e.*, conduct that invited the encounter, neither R nor defendant

---

[5] The dissent quotes *State v. Pierce*, 226 Or App 336, 344, 203 P3d 343 (2009), an unreasonable search case, for the proposition that "[d]rivers who run out of gas, Girl Scouts selling cookies, and political candidates all go to front doors of residences on a more or less regular basis." 286 Or App at 291-92 (DeVore, J., dissenting). But nobody contends that, after midnight, it would constitute an ordinary social encounter for Girl Scouts selling cookies, political candidates seeking votes, or drivers seeking gas to intrude on the solitude of the occupants of private property.

initiated the 9-1-1 call. *Cf. State v. Norman,* 114 Or App 395, 400, 835 P2d 146 (1992) (no seizure when defendant initiated the contact by coming over to the officer after officer followed defendant to private driveway). Here, the 9-1-1 call may have been the reason for Lewelling's late-night intrusion on R and defendant, but he did not communicate that he was checking on R's welfare in response to a 9-1-1 call, and he did not limit his intrusion to checking on R's welfare. Thus, we agree with the trial court that the time of night is one of the circumstances that affects whether a person in defendant's position would "reasonably believe that the officer is intentionally restraining the citizen's liberty or freedom of movement * * * in a way that exceeds the bounds of ordinary social encounters between private citizens."

3. *Investigatory focus*

The trial court also found that "it was clear" from Lewelling's comments to R that he was investigating whether she was having a "domestic issue," even if Lewelling did not use those exact words. As the court emphasized, after asking R in "defendant's presence if she was all right," Lewelling then asked her to speak to him outside of "the van and (separated from defendant). This context, combined with Lewelling's interest in running a check on defendant, would convey to a reasonable person that Lewelling was investigating defendant's possible involvement in the "domestic issue."

Lewelling's investigatory focus is a pertinent consideration in evaluating whether the combination of circumstances converted an otherwise lawful encounter into a seizure for purposes of Article I, section 9—although not necessarily dispositive. *See, e.g., Anderson,* 354 Or at 453 (considering circumstance that officer conveyed "possible suspicion" that the defendant could be involved in criminal activity as part of "the overall context of the contact," but ultimately concluding that the "brief verbal exchanges and inquiries" did not rise to the level of a seizure); *State v. Jackson,* 268 Or App 139, 149, 342 P3d 119 (2014) (explaining that, "[w]hen police officers make statements conveying possible suspicion, under some circumstances, they may not be exercising their authority to restrain"). For example, in

*State v. Rodriguez-Perez*, 262 Or App 206, 208, 325 P3d 39 (2014), the defendant and his brother were walking on a sidewalk carrying a box of beer when two officers approached, explained that they were concerned the men were underage, and then requested identification and took the identification to the patrol car to verify it. In concluding that, "[u]nder the principles articulated in *Backstrand*, those circumstances were sufficiently coercive to result in a seizure of defendant," we emphasized that the officers conveyed "that they suspected that the men were violating a law" before requesting and retaining their identification. *Id.* at 211-12; *see also State v. Thompson*, 264 Or App 754, 761, 333 P3d 1125 (2014) (considering, among circumstances that constituted a "stop," fact that officer told defendant that he suspected that drug activity was occurring on the premises and asked her if she was a drug user, while retaining her identification). As in the cases described above, the fact that Lewelling conveyed suspicion that defendant had done something to harm R, before requesting and running his identification, is an important circumstance in assessing whether the encounter was sufficiently coercive to result in a seizure of defendant.

### 4. *Lewelling's physical positioning*

Finally, the court found that Lewelling physically positioned himself behind the van to check on defendant's status and to question R, in a manner that the trial court viewed as conveying that "defendant was not free to leave."[6] In cases involving vehicles, this court has repeatedly held that the driver of a vehicle is stopped when officers position themselves in a way that prevents the defendant from leaving. *See, e.g., State v. Thacker*, 264 Or App 150, 156, 331 P3d 1036 (2014) (officer's patrol car had pulled up behind the defendant and prevented her vehicle from driving away);

---

[6] The dissent's characterization of Lewelling's presence as "momentary presence at the rear corner of a vehicle," *see* 286 Or App at 295 (DeVore, J., dissenting) departs from the trial court's findings regarding the evidence. The trial court found that Lewelling stood with R "behind the vehicle" in a way that, "if for nothing else the safety of the passenger[,] *** did effectively prevent the defendant from leaving for that period of time." Moreover, although the court did not make an express finding regarding the length of time that Lewelling questioned R behind the van, Lewelling testified that he had asked R to step out of the vehicle "for a few minutes" and that the conversation lasted "several minutes."

*State v. Wood*, 188 Or App 89, 91-92, 94, 69 P3d 1263 (2003) (concluding that, despite officer's instruction that the defendant was free to go following a traffic stop, a reasonable person in the "defendant's position would have felt that the officers had significantly restricted his freedom of movement," in part because officer who knew that the defendant intended to leave the car and walk across the street stood so that the defendant could not open his car door).

The state argues that defendant was not prevented from leaving because Lewelling's patrol car was not parked behind him and because defendant could have gotten out of the van and walked away. However, the relevant inquiry is not "whether defendant subjectively intended to leave." *Thacker*, 264 Or App at 156. In *Thacker*, we held that the officer's physical obstruction of the defendant's vehicle was "significant enough to effect a stop for the purposes of Article I, section 9" even though the defendant was, in fact, able to get out of her vehicle and walk toward the adjacent house. *Id.* at 157. That is because the test for whether an officer has effected a stop for the purposes of Article I, section 9, focuses entirely on whether a reasonable person in those circumstances would believe that the officer was "intentionally and significantly restrict[ing]" the person's freedom of movement. *Ashbaugh*, 349 Or at 316 (internal quotation marks omitted).

Moreover, even if it were physically possible for defendant to have walked away or asked Lewelling to move, Lewelling's choice to stand between the van and its access to the street hindered defendant's ability to leave the encounter and was a "show of authority" that the van would be staying put until Lewelling completed his investigation. *See State v. Rodgers/Kirkeby*, 347 Or 610, 627, 227 P3d 695 (2010) (when one officer stood at driver-side window and another stood on passenger side of car, that "was a sufficient 'show of authority' that, in combination with the unrelated questions concerning the items in the car and the request to search the car, resulted in a significant restriction of defendant's freedom of movement"); *State v. Washington*, 284 Or App 454, 468, 392 P3d 348 (2017) (observing that, "[i]f an officer uses a flashlight to block a person's view, and thereby hinders his or her ability to leave an encounter, it could contribute to a

conclusion that the officer engaged in a show of authority because a reasonable person might feel that he or she is not free to terminate the encounter).

Ultimately, despite some similarities to the cases discussed above—or to cases on which the dissent relies—this is not a case that can be resolved by fact-matching. As we emphasized in *Charles*, "were we to look at each piece of the encounter between defendant and the officer independently, we would not necessarily conclude that any one piece, standing alone, amounted to a stop." 263 Or App at 584. However, we consider all of the officer's actions as "a whole greater than the sum of its parts" to determine whether they restricted the citizen's movement in a significant way, "that exceeds the bounds of ordinary social encounters between private citizens." *Id.* at 583 (quoting *Backstrand*, 354 Or at 400)). Accepting the trial court's express and implied findings of fact, Lewelling knocked on the van window after midnight to interrupt defendant and R as they sat parked in R's residential driveway, communicated through his questioning that he was investigating defendant's possible involvement in a domestic issue, requested and ran a check on defendant's identification and did so while questioning R in position that conveyed that defendant was not free to drive away until Lewelling completed his investigations. Those circumstances in their totality confirm the trial court's conclusion that Lewelling engaged in a "show of authority such that" defendant was seized for purposes of Article I, section 9, before Lewelling learned that defendant's license had been suspended. *See Charles*, 263 Or App at 588.

C.  *Reasonable Suspicion*

As noted above, the state also argues that, in the event that we conclude defendant was stopped at the point that Lewelling stood behind the van to question R, *i.e.*, before he learned that defendant's drivers' license was suspended, we should conclude that any stop was supported by reasonable suspicion that defendant had committed the crime of DUII. *See, e.g.*, *Maciel-Figueroa*, 361 Or at 182 (emphasizing that, in order for an investigative stop to be lawful, it must be based on both objectively and subjectively reasonable suspicion). Defendant disputes that the circumstances gave rise

to reasonable suspicion, but he also argues that we should not reach the issue on the merits because the state did not make this reasonable suspicion argument in the trial court. We agree that the state did not preserve its argument that Lewelling possessed reasonable suspicion of DUII when he began his questioning of R.

"No matter claimed as error will be considered on appeal unless the claimed error was preserved in the lower court." ORAP 5.45(1); *see State v. Reynolds*, 250 Or App 516, 519, 280 P3d 1046, *rev den*, 352 Or 666 (2012). A party has preserved an issue for appellate review when, "the trial court had the opportunity to 'identify its alleged error with enough clarity to permit it to consider and correct the error immediately if correction is warranted.'" *State v. Smith*, 252 Or App 518, 521-22, 287 P3d 1210 (2012) (holding that an argument was preserved for appeal because the evidence presented, the nature of the motion, and the legal sources cited made the trial court "well aware of the issue before it" (quoting *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000))). The preservation rule ensures fairness to an opposing party by permitting that party to respond to a contention and not be taken by surprise. *Davis v. O'Brien*, 320 Or 729, 737-38, 891 P2d 1307 (1995).

We conclude that the state did not oppose the motion to suppress on the basis that it now raises on appeal, and the purposes of preservation were not satisfied. As indicated at the outset of this opinion, the hearing on the motion to suppress initially focused on whether Lewelling possessed probable cause when he arrested defendant for DUII (at a later point). During the course of the hearing, defendant learned new information, and the trial court allowed him to amend his motion to pursue the theory of a stop without reasonable suspicion. In response to that shift, the state argued that "no stop occurred until Officer Lewelling requested that Defendant perform field sobriety tests." In its closing argument, the state contended that it had "put forth evidence of reasonable suspicion" and then cited cases that support reasonable suspicion of intoxication.

On appeal, the state argues that its references to cases regarding reasonable suspicion at the hearing demonstrate

an "implicit" argument to the trial court that if Lewelling stopped defendant at any point, he had reasonable suspicion. We disagree. While the state's reasonable suspicion argument to us focuses on two facts known to Lewelling at the point that we have determined a stop occurred: defendant's slurred speech and an odor of alcohol, the state's reasonable suspicion argument to the trial court emphasized observations that Lewelling made after he had learned about defendant's license suspension, returned to defendant's side of the van, and asked defendant to get out of the vehicle for field sobriety tests. The state elicited testimony from Lewelling regarding his subjective belief that defendant had been driving under the influence of intoxicants *at that point* and regarding the objective bases for that belief. Post-hearing, when it was clear that defendant was arguing that a stop occurred at a point before Lewelling knew about the suspension, the state argued in its supplemental memorandum only that Lewelling had not stopped defendant at any earlier point, without arguing that any earlier stop was supported by reasonable suspicion of DUII.

The state failed to explain how either the trial court or defendant would have understood that the state also believed that the evidence established reasonable suspicion at any point before Lewelling learned that defendant had a suspended license. Indeed, the court's written opinion, which contains no findings regarding Lewelling's suspicion and no discussion regarding the reasonableness of any suspicion, reflects that the court was not alerted that the state was making the reasonable suspicion argument that it now raises on appeal. Therefore we conclude that the state's reasonable suspicion argument is not preserved and do not consider that alternative challenge to the trial court's ruling.

## IV. CONCLUSION

"'Whenever the state has obtained evidence following the violation of a defendant's Article I, section 9, rights, it is presumed that the evidence was tainted by the violation and must be suppressed.'" *State v. Davis*, 282 Or App 660, 674 n 6, 385 P3d 1253 (2016) (quoting *State v. Miller*, 267 Or App 382, 398, 340 P3d 740 (2014)). Our conclusion that defendant was stopped for purposes of Article I, section 9,

without reasonable suspicion, fully resolves the appeal, because the state has not made any argument that the challenged evidence was, nevertheless, admissible. *See State v. Dawson*, 282 Or App 335, 347, 386 P3d 165 (2016) (declining to consider the state's argument that discovery of the evidence was attenuated from the illegality because it was not raised below, and "'the burden has long been on the state to establish attenuation'" (quoting *State v. Jones (A154424)*, 275 Or App 771, 776, 365 P3d 679 (2015)); *see also Davis*, 282 Or App at 674 n 6 (explaining that, absent a developed argument by the state that, in the event we conclude that the search of defendant was unlawful, the challenged evidence was nevertheless admissible, we conclude that the evidence must be suppressed).

Affirmed.

**DeVORE, J.,** dissenting.

Upon reflection, this should not be seen to be a close case, let alone one in which a constitutional violation is the conclusion. Such a conclusion is contrary to *State v. Backstrand*, 354 Or 392, 313 P3d 1084 (2013), *State v. Highley*, 354 Or 459, 313 P3d 1068 (2013), and *State v. Anderson*, 354 Or 440, 313 P3d 1113 (2013).

We know from *Backstrand* that "[w]hat distinguishes a seizure (either a stop or an arrest) from a constitutionally insignificant police-citizen encounter 'is the imposition, either by physical force or through some "show of authority," of some restraint on the individual's liberty.'" *Backstrand*, 354 Or at 399 (quoting *State v. Ashbaugh*, 349 Or 297, 309, 244 P3d 360 (2010)). In order to be deemed a seizure, "what is required is a show of authority by which, through words or action, the officer's conduct reasonably conveys that the officer is exercising his or her authority to *significantly* restrain the citizen's liberty or freedom of movement." *Id.* at 402 (emphasis added).

We know that "'verbal inquiries [by officers] are not *** seizures.'" *Id.* at 403 (quoting *State v. Rodgers/Kirkeby*, 347 Or 610, 622, 227 P3d 695 (2010)). As the majority recognizes, something more than simply questioning a person is needed to suggest a seizure. "The 'something more' can

be such things as the content or manner of questioning, or the accompanying physical acts by the officer, if those added factors would reasonably be construed as a *'threatening or coercive'* show of authority requiring compliance with the officer's request." *Id.* at 403 (quoting *Ashbaugh*, 349 Or at 317 (emphasis added)).

In this regard, it is not enough to suggest a seizure simply because a person may surmise that an officer is probing whether the person might have some connection to suspicious activities. Thus, it was insufficient to suggest a seizure in *Anderson* when the officer "conveyed possible suspicion that [a] driver and defendant could be involved in criminal activity related to [an] apartment" that was being searched. *Anderson*, 354 Or at 453. Such unexpressed or indirect suspicion is to be distinguished from a "continuation of investigatory activities," after an initial identification check, with pointed questioning of the defendant about illegal activities. *Backstrand*, 354 Or at 411-12, 416 (citing *State v. Hall*, 339 Or 7, 19, 115 P3d 908 (2005), and *State v. Painter*, 296 Or 422, 424-25, 676 P2d 309 (1984)).

We know that no violation of Article I, section 9, of the Oregon Constitution occurs so "long as the officer does no more than seek the individual's cooperation through noncoercive questioning and conduct. A request for identification, in and of itself, is not a seizure. Nor is an officer's act of checking the validity of that identification, in and of itself, a seizure." *Id.* at 417. A person "can expect that the officer will do something with that identification, such as seek to verify the person's identity or status." *Highley*, 354 Or at 470. That the officer retains the identification for a reasonable time while doing so does not "transform a noncoercive encounter into one in which the individual's liberty is significantly restrained through an exercise of coercive police authority." *Id.*

If all that is true, then why would the encounter in this case be seen as a coercive encounter with a show of force that "significantly" restricts defendant's liberty? The majority cannot point to Officer Lewelling's request for defendant's identification, nor the time it took to step to the rear of the van, call in to verify information from defendant's Oregon

ID card, and wait for a response from dispatch while talking to R, defendant's passenger.[1] What the majority identifies are four circumstances, which alone or collectively, should fail to constitute a seizure.

The majority is influenced first by location. Defendant was outside R's residence, sitting in R's van, which was parked in R's driveway. The majority emphasizes that it was "private residential property." 286 Or App at 281. It is certainly true that the Supreme Court in *Backstrand* quoted a statement that "'law enforcement officers remain free to approach persons *on the street or in public places*, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful.'" *Backstrand*, 354 Or at 400 (quoting *State v. Holmes*, 311 Or 400, 410, 813 P2d 28 (1991) (emphasis added)). And, it is true that the court found the intrusion into a *home* to be significant when officers responded to a 9-1-1 call by knocking on the door, ordering the defendant and her husband to come out and remain on the porch, where they were separated and questioned. *State v. Fair*, 353 Or 588, 590-91, 600-01, 302 P3d 417 (2013). The court's reference to location—whether it be home, automobile, or street—was followed with this observation: "A government intrusion into the *home* is at the extreme end of the spectrum: 'Nothing is as personal or private. Nothing is more inviolate.'" *Id.* at 600 (quoting *State v. Tourtillott*, 289 Or 845, 865, 618 P2d 423 (1980), *cert den*, 451 US 972 (1981) (emphasis added)). The officer's command to the defendant to come out of the home and be confined to the porch "amounted to a significant restraint on defendant's liberty *within her own home* sufficient to constitute a seizure." *Id.* at 601 (emphasis added).

On the other hand, we generally recognize that an officer may approach a citizen's front door and knock on it without effecting a seizure. In *State v. Portrey*, 134 Or App 460, 464, 896 P2d 7 (1995), we observed that "absent evidence of an intent to exclude, an occupant impliedly consents to

---

[1] Defendant, who sat in the driver's seat and whom a caller described as the van's driver, gave an Oregon ID card, rather than a driver's license.

people walking to the front door and knocking on it, because of social and legal norms of behavior." Similarly, we would not conclude that an officer's request that a person come out of a residence to talk to the officer, on its own, would constitute a stop. *State v. Charles*, 263 Or App 578, 584, 331 P3d 1012 (2014) (determining a seizure occurred where circumstances added more). Generally speaking, an officer does not invade a privacy interest, although on "private residential property," when merely walking up a driveway or crossing a front yard to approach a front door or side entry that is visible from the sidewalk. *See State v. Pierce*, 226 Or App 336, 343-48, 203 P3d 343 (2009) (reviewing cases). We have explained:

> "'Drivers who run out of gas, Girl Scouts selling cookies, and political candidates all go to front doors of residences on a more or less regular basis. Doing so is so common in this society that, unless there are posted warnings, a fence, a moat filled with crocodiles, or other evidence of a desire to exclude casual visitors, the person living in the house has impliedly consented to the intrusion.'"

*Id.* at 344 (quoting *State v. Ohling*, 70 Or App 249, 688 P2d 1384, *rev den*, 298 Or 334 (1984)).

In this case, defendant did not sit in *his* van, nor was he anywhere near *his* home. He was outdoors in the driveway in R's van outside her home in a location that was visible from the street and in a location likely traversed by Girl Scouts selling cookies or political candidates who would approach the house. Why, in the majority's view, a public safety officer should be less privileged than the postal carrier is troubling. It is troubling because officers routinely traverse the front-side curtilage of "private residential property" in order to respond, as here, to 9-1-1 calls reporting angry or intoxicated arguments or, in other cases, to 9-1-1 calls reporting domestic violence, which have been known to occur on "private residential property." The majority should have given no weight to this location.

The majority next factors that this was a "late-night interruption." 286 Or App at 281. The majority finds it significant that Lewelling made an "intrusion on the couple as they sat quietly in R's van" after midnight in R's driveway.

*Id.* at 282. The majority agrees with the trial court that Lewelling's entry onto private property to knock on the van's window was "significantly beyond that accepted in ordinary social intercourse." *Id.* However, Lewelling was there because a convenience store employee had called dispatch to report a woman who was crying, intoxicated, and hysterical who had left in a van with a man driving. The van's license plate led to Lewelling finding the same van in the owner's driveway with a man and woman. It all matched. That the officer responded "late at night" was because he responded promptly to the risk of a problem when it occurred, rather than wait for banking hours the next day. That the officer responded when the couple was "quiet," with her head on his chest, was because dispatch had relayed a witness report of a much different scene. No doubt police officers understand that relationships between abuser and abused may be mercurial, the abused may fear a partner's wrath or removal, or an abuser may have coerced the abused to deny abuse. The majority should not have found the hour of the night or the seeming tranquility to contribute toward a significant restraint that constitutes a seizure.

The majority next factors that defendant may have surmised from Lewelling's question to R that defendant might be involved. Lewelling saw that R had been crying. Her eyes were red and puffy; her cheeks were wet with tears; and her make-up ran down her face. Lewelling asked if she was all right. Lewelling's question, however, was to R, not to defendant. Lewelling asked for defendant's identification in a friendly and conversational tone. Lewelling then asked R to step out to talk to him; Lewelling did not ask defendant to step out of the van in order to be questioned. Those circumstances are no different than the circumstances in *Anderson* where the defendant and companion learned from the officers information that "objectively conveyed possible suspicion that [they] could be involved in criminal activity related to [the search of an] apartment." 354 Or at 453. Lewelling's "possible suspicion" is not the same, even while checking identification, as detaining and questioning a defendant directly about the defendant's criminal conduct. *Backstrand*, 354 Or at 412, 416 (citing *Hall*, 339 Or at 19 and *Painter*, 296 Or at 425). Here, "investigatory focus" is

not sufficient to be a contributing circumstance. *Backstrand* recognizes that a citizen may be "discomforted" by an officer's approach and inquiry. 354 Or at 400. A citizen may feel "obliged to cooperate with the officer simply because of the officer's status," but that is "not the form or source of coercion that is of constitutional concern." *Id.* at 401. Defendant may well have felt constrained to wait while his companion satisfied Lewelling's inquiry. But that is not a restraint dictated by the officer, that is not the result of a "show of force," and that is not a coercive contributor toward a constitutional violation. The majority should not have given weight to "investigatory focus."

Finally, the majority factors that Lewelling's physical position, when standing at the rear of R's van, contributes toward a seizure. When R stepped out of the van, Lewelling had met her at the "back rear corner of the driver's side of the vehicle." It is certainly true that when an officer pulls into a 30-foot driveway and parks a patrol car less than a car length behind a defendant's car, leaving no room to maneuver and depart, the officer has communicated, in a bold and physical way, that the defendant is not free to leave. *See State v. Thacker*, 264 Or App 150, 156, 331 P3d 1036 (2014) (reviewing cases on patrol cars blocking a defendant's car). In *Thacker*, we rejected the state's argument that defendant should have been able to think, at least initially, that she was free to walk on into her house. *Id.* at 154-57. We held that the paramount fact was that the patrol car blocked her car, communicating that she was not free to leave. *Id.*

Our case here, better resembles *State v. Porter*, 38 Or App 169, 589 P2d 1156 (1979), where defendant had been parked in a parking lot and "gave no indication of an intention to move." He "was free to move his car, although he would have had to maneuver around the police car." *Id.* at 171; *see also State v. Norman*, 114 Or App 395, 835 P2d 146 (1992) (defendant's vehicle was blocked in his driveway by the patrol car but defendant got out, walked to the patrol car, and asked if the officers wanted to talk to him).

Here, Lewelling arrived without having activated a siren or overhead lights. He carefully parked the patrol car on the street so as *not* to block R's car in her driveway. The

second officer, who arrived thereafter, did the same, parking on the street leaving the driveway clear, and assuring that the van remained unimpeded. More than anything, those facts communicated that, because the van was *not* blocked, the officers were minimizing their presence and making no show of force. As a result, other facts become significant. That is, defendant was not stopped in route or blocked in the course of travels. Rather, he drove R's van to her home late at night, stopped, and parked. By all indications, they were at their destination.

Lewelling had not directed defendant to remain in the van. Defendant could have walked on into the house, the couple's apparent destination, expecting R to follow soon. To be sure, it is more likely that defendant waited for the return of his Oregon ID. But, to be briefly detained while identification is verified is not a seizure. *Backstrand*, 354 Or at 417; *Highley*, 354 Or at 470. It is equally likely that defendant waited for the return of R, after she had satisfied Lewelling's inquiry about her well-being. But, to wait out of courtesy to his companion or out of respect for the officer is not the result of coercion, a show of force, or a restraint on defendant's liberty imposed by the officer.

Although Lewelling stood at the rear corner of the van, he did so only long enough to ask R about her situation, outside defendant's immediate presence. Lewelling did so while he called in defendant's identification and awaited a response from dispatch. In that interval, defendant remained in the van but not due to some unspoken communication represented by Lewelling's presence at the rear of the van. To suppose that Lewelling's presence at the rear corner of the van communicated restraint is more fanciful than real. After hearing R's version of matters and learning from dispatch that defendant's license was suspended, Lewelling promptly returned to the van's driver-side window. Under those circumstances, there was no real restraint against the movement of R's parked vehicle. Consequently, the majority should not have treated an officer's momentary presence at the rear corner of a vehicle the same as when an officer parks a patrol car behind a defendant's vehicle for a whole encounter. The bold coercive message communicated

by blocking a car in is quite different from pausing to stand at the corner of a car to converse.

Taking all the circumstances together, the majority allows that, if it were to look at each piece of the encounter independently, the majority would not necessarily conclude that any one piece alone, amounted to a stop. Yet, considering the officer's actions as "a whole greater than the sum of its parts," the majority concludes Lewelling caused an unconstitutional seizure. 286 Or App at 286. The majority's calculation is incorrect.

In *Highley*, on its own facts, the Supreme Court rejected the suggestion that a collection of weak considerations, when combined, should constitute a violation. The court concluded:

> "No similar alchemy occurred here. None of [the officer's] actions—the request for identification, the check of defendant's probationary status, and the request for consent to search—individually constituted a seizure. Considered in combination, they were simply acts that occurred sequentially. They did not combine to form a whole greater than the sum of their parts."

354 Or at 473. The same is true in the case at hand.

Each of the majority's considerations—location, late-night interruption, investigatory focus, and Lewelling's interval at the rear corner of the van—do not individually evidence the requisite show of authority. Nor, together, do those considerations amount to a show of force, a "significant" restraint on defendant's liberty, or a violation of Article I, section 9, of the Oregon Constitution. That is why this should not be seen as a close case. I believe that the trial court erred in granting defendant's motion to suppress the evidence. I fear that the majority's decision will cast a shadow on police response to reports of disturbances where reasonable suspicion is not yet apparent but domestic violence on "private residential property" has been suffered. For those reasons, I respectfully dissent.