Argued and submitted August 23, reversed and remanded October 26, 2022

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

LUKE JOSIAH EMERY ELBINGER,
*Defendant-Appellant.*

Linn County Circuit Court
20CR03569; A175045

521 P3d 179

Defendant appeals a conviction of unlawful possession of methamphetamine following a conditional no contest plea. Defendant assigns error to the denial of his motion to suppress, arguing that he was unconstitutionally stopped prior to the time a police officer had reasonable suspicion of defendant's involvement with an associated shoplifting arrest. *Held*: The trial court erred in denying the motion because defendant was unlawfully stopped under Article I, section 9, of the Oregon Constitution. When the officer approached defendant, the officer already had the shoplifter in custody in the back of his patrol vehicle, and the officer was investigating defendant's connection to the shoplifter. By the time the officer radioed a description of defendant to another officer, it would have been reasonable for defendant to believe that he was no longer free to leave, and the encounter had evolved into a stop. When the officer did so, he had not yet formed a reasonable suspicion that defendant was involved in the shoplifting. As a result, the stop was unlawful, and the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.

Brendan J. Kane, Judge.

Mark J. Kimbrell, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Erica L. Herb, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagán, Judge.

PAGÁN, J.

Reversed and remanded.

## PAGÁN, J.

Defendant entered a conditional plea of no contest to the charge of unlawful possession of methamphetamine, ORS 475.894 (2019).[1] On appeal, defendant assigns error to the trial court's denial of his motion to suppress, arguing that the methamphetamine was discovered after an unlawful stop. For the reasons discussed below, we agree that defendant was unlawfully stopped under Article I, section 9, of the Oregon Constitution. Therefore, the trial court erred in denying his motion to suppress. We reverse and remand.

We review the denial of defendant's motion to suppress for legal error, and we are bound by the trial court's findings of historical fact if the evidence in the record supports them. *State v. Prouty*, 312 Or App 495, 496, 492 P3d 734 (2021). We state the facts, which are undisputed, in accordance with that standard of review.

In December 2019, Albany Police Officer Ard arrested a shoplifter about two blocks from a Fred Meyer store. The arrestee said his name was "Luke" or "Lukese Tucker." Later, when the arrestee was being transported to jail, Ard learned from another police officer that the shoplifter's real name was Morgeson. Ard found a list of items in Morgeson's pocket. Morgeson admitted that he was stealing items for his girlfriend.

While Ard was driving Morgeson back to the Fred Meyer store, Morgeson pointed to a green Subaru in the Fred Meyer parking lot. Morgeson asked Ard to tell its occupants that he had been taken into custody. Ard observed one male and one female sitting in the car, which was backed into a parking space close to an exit from the parking lot.

Ard pulled forward into the parking space next to the Subaru, but he did not block it. Ard greeted the driver—defendant—and he told defendant that the conversation was being recorded. Ard asked, "Does one of you guys belong to Lucas, Lukese?" Defendant, who was sitting in the Subaru, appeared confused. Defendant said that he was Luke, and, while stepping out of the Subaru, asked, "Why? What's up?"

---

[1] ORS 475.894 was amended in 2021 in ways that do not bear on our analysis. *See* Or Laws 2021, ch 591, § 39.

Ard responded, "Who's that guy then that I got in my car? He says his name's Luke."

Defendant could not see who was in the back of the patrol vehicle, so he asked, "What's he look like?" Ard responded, "He's white." Defendant showed Ard his identification. Ard laughed and said, "So you're also Luke. He said to stop by here and let you know he's in custody." Defendant responded, "Oh, ok."

Ard continued, "Were you here shopping with somebody? We're being recorded just so you know." Defendant responded that he was "just the driver." Ard stated, "Well, he was stealing a whole bunch of stuff. That's why he's in the back of our car." Ard repeated that the shoplifter asked him to "stop at that green Subaru," and Ard joked that "you're both Luke, theoretically." Ard asked if the passenger was the shoplifter's girlfriend and, when defendant nodded, Ard indicated that he needed "to talk to her real quick."

Ard walked to the passenger side of the Subaru and asked the passenger if he could talk to her. Her car door was slightly open. Ard asked her to step out, but she remained in the car. Ard communicated via his radio that he was "out with the other half of this to the southeast of the gas pumps."

The passenger opened the car door more widely and asked, "What's up?" Ard said, "Do you belong to other Luke?" The passenger said no. Ard asked for identification, but she said that she did not have any. After taking out his notepad and a pen, Ard asked the passenger for her name and date of birth. Ard wrote down the information and conveyed it to dispatch. By that time, defendant was back inside the Subaru on the driver's side.

Ard asked, "What's it like having a birthday next door to Christmas?" The passenger responded, "It sucks." Ard explained that "the guy I have in custody in the back of my car for stealing says that you're his girlfriend and that he was stealing for you and he has a list of things." The passenger asked, "Why would he say that?" Ard responded, "[Because] he doesn't have money to buy you stuff for Christmas?" After a pause, the passenger asked why Ard

was running her name. Before Ard could answer, the passenger began to say something but stopped herself.

Next, Ard asked, "So, what brought you guys here today?" After a pause, the passenger replied that they wanted to go shopping. Ard communicated with another person via his earpiece and stated, "Affirm. I'm out with it."[2] Ard asked both defendant and the passenger whether their contact information was current. They both said yes. Ard asked the passenger for a good contact phone number, which she could not provide. Defendant provided a number and he indicated that it was the passenger's number.

After a pause, Ard stated, "Copy." Ard asked, "So where was Luke, other Luke, supposed to meet you guys?" The passenger responded, "Uh, the car?" Then Ard stated, "Affirm. Occupied twice. One black male. One white female." After another pause, Ard stated, "Yep." At the motion to suppress hearing, Ard explained that he provided the description of the occupants of the Subaru in response to a question from Officer Beckwith, who he was communicating with via radio. Then Beckwith "asked if there was a tall black male with dreadlocks present inside the car. I told him there was."

After another pause, Ard asked, "Were either of you guys in the store today?" The passenger said no, but defendant said, "I went in very briefly and went to the bathroom and came back out." The passenger said that she went to the yogurt shop. Around the same time, Beckwith told Ard that a person matching defendant's description met up with the shoplifter inside the store and was also a suspect. After learning that information, Ard stated, "Copy," and he advised defendant and the passenger of their *Miranda* rights. Subsequently, the passenger admitted that there were items in the Subaru that had been stolen from the Fred Meyer store. During a search of defendant, police discovered methamphetamine.

---

[2] The information conveyed to Ard via his earpiece is not audible in his body camera footage, and defendant could not hear it. At the motion to suppress hearing, Ard stated that he was responding to a question from Officer Beckwith asking whether Ard was out with the car. While defendant could not hear what Beckwith was saying, at oral argument, the state acknowledged that it is reasonable to infer that defendant could hear Ard's responses to Beckwith.

In moving to suppress that evidence, defendant argued that he was seized when Ard told defendant that "the person in the back of his patrol vehicle had admitted to shoplifting and identified * * * defendant as someone he knew." At the hearing, the trial court heard testimony from Ard and defendant, viewed some of Ard's body camera footage, and heard argument from counsel, before denying the motion. The trial court pointed out that Ard talked to both defendant and the passenger for only 10 minutes, and that Ard spent most of that time with the passenger. The trial court noted Ard's "jovial, self-deprecating" demeanor. The trial court stated that it would send a letter to counsel via email that contained a detailed explanation of its findings. In that letter, the court focused on "the brevity of Officer Ard's encounter with Defendant, Officer Ard's jovial manner, [and] his relative lack of interest in talking with * * * Defendant." The trial court issued an order denying the motion. In entering a conditional plea of no contest to the charge of possession of methamphetamine, defendant reserved his right to seek review of the order denying his motion to suppress.

On appeal, focusing on the totality of the circumstances, defendant reiterates that he was unlawfully stopped before Ard formed a reasonable suspicion of his involvement in the shoplifting: "The totality of Ard's conduct—his questions and statements connecting defendant and his passenger to the shoplifter, his positioning outside defendant's passenger door, and his reporting defendant's description to another officer—would have communicated to a reasonable person in defendant's position that he was not free to terminate the encounter." The state contends that defendant was not seized before the officer provided him with *Miranda* warnings.

Article I, section 9, protects against unreasonable searches and seizures. Although law enforcement officers are not required to justify every encounter with citizens, they must justify a seizure. *State v. Backstrand*, 354 Or 392, 399, 313 P3d 1084 (2013). A seizure can be either a stop, which generally requires reasonable suspicion, or an arrest, which requires probable cause. *Id*. A seizure occurs when

there is "'the imposition, either by physical force or through some "show of authority," of some restraint on the individual's liberty.'" *Id.* (quoting *State v. Ashbaugh*, 349 Or 297, 309, 244 P3d 360 (2010)). "For the purposes of Article I, section 9, a seizure occurs when (1) a police officer intentionally and significantly interferes with an individual's liberty or freedom of movement; or (2) a reasonable person, under the totality of the circumstances, would believe that his or her liberty or freedom of movement has been significantly restricted." *State v. Arreola-Botello*, 365 Or 695, 701, 451 P3d 939 (2019).

The line separating encounters from seizures is neither bright nor clear and, because of that, our inquiry is "fact-specific and requires an examination of the totality of the circumstances involved." *Backstrand*, 354 Or at 399. The show of authority must be "something more than just asking a question, requesting information, or seeking an individual's cooperation." *Id.* at 403. Indeed, "'law enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful.'" *Id.* at 400 (quoting *State v. Holmes*, 311 Or 400, 410, 813 P2d 28 (1991)). A seizure occurs, however, when an officer conveys to the person "either by word, action, or both, that the person is not free to terminate the encounter or otherwise go about his or her ordinary affairs." *Backstrand*, 354 Or at 401. If an officer does not have reasonable suspicion when a stop occurs, then the stop is unlawful, and all evidence discovered as a result of the unlawful police action is presumed tainted by the violation and must be suppressed. *State v. Newton*, 286 Or App 274, 288-89, 398 P3d 390 (2017).

With those legal principles in mind, we turn to the facts. We recognize that police officers may "approach and question persons sitting in parked vehicles without triggering constitutional protections against unreasonable seizures." *State v. Reyes-Herrera*, 369 Or 54, 65, 500 P3d 1 (2021) (internal quotation marks omitted). But "no one fact is determinative, and context is critical." *Id.* at 67.

"The question for the court is whether the circumstances as a whole transformed the encounter into a seizure, even if the circumstances, individually would not create a seizure." *Newton*, 286 Or App at 280 (internal quotation marks omitted).

Here, we conclude that defendant was unlawfully stopped at the point that Ard radioed a description of defendant to Beckwith. When Ard approached the Subaru, Ard already had a shoplifter in custody sitting in the back of his patrol vehicle, and he informed defendant of that fact. Ard asked defendant and the passenger whether they "belong[ed]" to the person in the back of the patrol car who "said to stop by here and let you know he's in custody." Ard asked defendant if he was "shopping with somebody." And, while we have already acknowledged that police officers can question persons sitting in parked vehicles without triggering constitutional protections, the circumstance of being approached by a police officer who already had someone in custody, and who was probing defendant's connection to that person, created "a more coercive atmosphere." *Reyes-Herrera*, 369 Or at 65-66.

By itself, Ard's initial exchange with defendant was insufficient to constitute a stop, and Ard soon moved to the passenger side of the Subaru. However, when investigating the passenger's connection to the shoplifter, Ard continued to address some of his questions to both of them. As explained more fully below, by the time Ard radioed a description of the Subaru's occupants to Beckwith, it would have been reasonable for defendant to believe that he was no longer free to leave, and the encounter had evolved into a stop. *See Newton*, 286 Or App at 280 (courts must consider the circumstances as a whole in evaluating whether an encounter transformed into a seizure).

In arguing otherwise, the state points out that Ard, without any backup or show of force with other officers, approached defendant in the late afternoon in a shopping center parking lot and did not order defendant to do anything or direct his movements. For example, Ard did not order defendant to step out of his vehicle or to provide identification; instead, defendant did so voluntarily. But,

in *Reyes-Herrera*, 369 Or at 67, the Supreme Court determined that a stop occurred even though "only one officer was present in the public place" and before the officer began directing the defendant's movements. A key factor in *Reyes-Herrera* was the nature of the police officer's questions, which indicated that the defendant was the subject of a criminal investigation and therefore not free to leave. *Id.* at 66-67.

The instant case is similar to *Reyes-Herrera*. Ard's conduct, questions, and statements became less conversational and more investigatory once he walked to the passenger side of the Subaru. For example, Ard took out a notepad and pen, wrote down the passenger's name and date of birth and conveyed the information to dispatch. Ard asked the passenger for a good contact number, which defendant provided on her behalf. During those exchanges, Ard was communicating with dispatch or Beckwith. For example, before Ard asked whether their contact information was current, Ard stated, "Affirm. I'm out with it." After defendant provided a phone number for the passenger, Ard stated, "Copy." When Ard provided a description of defendant to Beckwith, it became clear that defendant was part of the investigation, and it would not have been reasonable for defendant to believe he was free to leave. *Id.* at 62 ("[T]he critical question *** depends on the totality of the circumstances and the extent to which those circumstances would lead reasonable people to believe that their liberty or freedom of movement has been significantly restricted.").

The state claims that Ard was investigating the passenger, not defendant. But many of Ard's questions were directed to both of them. For example, he asked, "What brought you guys here today?" Ard asked them both if the information on their licenses was current. And, most importantly, Ard radioed a description of both to Beckwith. *See State v. Stevens*, 364 Or 91, 94, 101-02, 430 P3d 1059 (2018) (officer's stop of driver did not seize a passenger, but the officer's questions and actions "became increasingly coercive," and the passenger was seized when the officer told her that she could get in trouble with her parole officer if she failed to provide another passenger's real name).

We acknowledge that the line between noncoercive conversation and "something more" restrictive is not easy to draw and that "a slight difference in circumstances could make what was considered a nonrestrictive encounter in one case a stop in another." *Reyes-Herrera*, 369 Or at 67. In the instant case, Ard's demeanor was professional, and sometimes jovial, including when he joked with defendant about the shoplifter's name. But "the overall context of an encounter may convey to a citizen that [he] is not free to leave, even if the content or manner of the officer's questions alone does not." *State v. Almahmood*, 308 Or App 795, 803, 482 P3d 88 (2021) (internal quotation marks omitted).

Finally, by his own admission, when Ard provided a description of defendant to Beckwith, Ard had not yet formed a reasonable suspicion that defendant was involved in the shoplifting. Ard did not do so until a few moments later, after he asked whether "either of you guys" had been in the store, and while defendant and the passenger were responding to his question. Ard testified that he formed a reasonable suspicion of defendant's involvement in the crime when Beckwith told him that someone matching defendant's description had been with the shoplifter inside the store. Because the stop occurred before Ard had reasonable suspicion, it was unlawful. *Reyes-Herrera*, 369 Or at 67-68.

The state does not argue that the challenged evidence was attenuated from the unlawful stop or was admissible for any other reason. *See Newton*, 286 Or App at 288-89 ("Our conclusion that defendant was stopped for purposes of Article I, section 9, without reasonable suspicion, fully resolves the appeal, because the state has not made any argument that the challenged evidence was, nevertheless, admissible."). For all of those reasons, we conclude that the trial court erred in denying the motion to suppress. Because defendant entered a conditional plea, we reverse and remand without engaging in a harmless error analysis. *See State v. Lowell*, 275 Or App 365, 383, 364 P3d 34 (2015) (no harmless error analysis on appeal from conditional plea).

Reversed and remanded.